## Burke *versus* Maxwell's Administrators.

1. A judge may express to a jury an opinion on the facts in a case properly referred to them ; but must not infringe their province, so as to mislead them or relieve them of full responsibility of pronouncing judgment on the facts themselves.

2. When there is sufficient evidence for a jury on a given point, the judge should submit it calmly and impartially.

3. If the judge states the evidence he should state it accurately, as well that which makes for a party as that which makes against him.

4. The judge should studiously avoid deductions and theories not warranted by the evidence

5. A judge charged: "In all I have said there is substantially no law, and I am simply giving you my impressions of this case. You are not bound at all by anything I have said. * * * Instructions as to mere matter of fact, as to what the evidence has been, the weight of it or the inferences it will bear, are all for your consideration. You are judges of the whole matter. * * * I have deemed it important to present views which, were I in the jury-box, would control me in giving my verdict against the plaintiff." *Held*, to be error.

6. Plaintiff alleged that he had bought stock from defendant, who had guarantied that it would be of a certain value in six months ; in a suit on the guaranty he gave in evidence receipts from defendant for $4000 for stock. The defendant's allegation was, that the stock had not been bought by plaintiff, but he had been intrusted with the receipts to sell stock to others. The court charged: Plaintiff "must satisfy you he bought this stock; he must satisfy you he had $4000 to put into it." *Held*, to be error; it was not essential to prove he had $4000.

7. Defendant was member of a partnership which had a claim against plaintiff; the other partners authorized the defendant to set off the firm claim against plaintiff's. The court instructed the jury that if they found against plaintiff on the guaranty, and found for the firm claim, they should certify for defendant the amount due to firm. *Held*, not to be error.

8. The charge in this case beyond any recognised rule in the discussion of the evidence.

February 18th 1876. Before AGNEW, C. J., SHARSWOOD, MERCUR, GORDON, PAXSON and WOODWARD, JJ.

[Burke *v.* Maxwell's Adm'rs.]

Error to the District Court of *Philadelphia:* Of July Term 1874, No. 108.

This was an action of assumpsit, brought April 25th 1871 by Michael R. Burke against Anna G. Maxwell, VanCamp Bush and William E. Smith, administrators, &c., of Ebenezer Maxwell, dec'd.

The declaration was on a contract of guaranty; that, in consideration that plaintiff would purchase from decedent 800 shares of stock of the Tarr and Scott Farm Oil Company at $5 per share; within six months from the time of said purchase the said stock would sell in the market for $7 per share; that the stock did not at any time within six months from the time of purchase, or at any time subsequent thereto, sell for the price so warranted, but became utterly worthless.

The pleas were: Non-assumpsit, statute of limitations, payment with leave, &c., and set-off.

Maxwell, the decedent, had been in partnership with W. P. Bangs, under the firm name of Bangs & Maxwell. The plaintiff had been a clerk in that firm; it was alleged that he had overdrawn his account to the amount of $1400; Bangs, who died after this suit was brought, and his administratrix, after his death, agreed that the claim of the firm for the overdrafts might be set off against plaintiff's claim in this suit.

The case was tried May 4th 1874, before Lynd, J.

For the plaintiff, James L. McCartney testified:—

"In the latter part of 1864 Burke called almost every day about the purchase of the Tarr and Scott farm oil stock. I called about the same time on Maxwell; * * * to ascertain whether Burke's statement was correct; I was introduced to Maxwell by Burke. Maxwell said the company wanted money very badly; that the farm cost more money than they expected, and that was their reason for selling. I again called on Maxwell in 1865. I asked him if he had sold Burke any of the stock. He said several hundred shares. I asked him what he had charged Burke. He said $5 per share. He said that he would give me the stock on the same terms; that he had given Burke a guaranty that if the stock did not bring from $7 to $10 in six months, he would refund the money. I then took 250 shares and paid $1250 to Maxwell; * * * Maxwell said Burke had bought 800 shares. * * * I saw Maxwell several times after that; he put me off from time to time. I saw him after the six months had expired. He then put me off. He promised to pay me in a few days, when he paid Mr. Burke. I again saw him a few days after. He said the company were to have a meeting, and after the meeting he would decide what he would do. I didn't see Maxwell after that. These interviews were some time in September or October 1865. I also saw Mr. Burke; he was as bad as Maxwell."

Being cross-examined he said: "Burke first called my atten-

tion to the stock.    Burke did not exhibit any paper authorizing him to sell the stock.    I bought the stock the beginning of 1865. At both interviews only Burke, Maxwell, and myself were present. * * * Before I bought the stock Maxwell said he had given Burke a guaranty that in six months they would sell from $7 to $10. * * * Maxwell said he had sold Burke several hundred shares. I asked him how many, and he replied 800.    Burke himself had none of the shares for sale.    I saw Maxwell some seven or eight months after I paid my money.    He made some reference to losses they had had by a flood which swept some barrels of oil away. * * * I sued the defendants on my stock to recover the $1250.    The verdict was against me.    In that case Burke was my only witness."

A number of witnesses were called, who testified that the signature to the following paper (called Á) was Maxwell's; several of them saying that his signature was not uniform :—

| " James Word | . | . | . | . | 500 shares. |
| * * * * | | | | * * * | |
| " M. R. Burke | . | . | . | . | 500 " |
| " J. L. McCartney | . | . | . | 250 " |
| * * * | | | | * * * | |
| " M. R. Burke | . | . | . | . | 250 " |
| * * * | | | | * * * | |
| Total | . | . | . | . | 3000 " |

" I have authorized M. R. Burke to issue my guarantee for the value of the above shares to the parties named therein when organized, viz., $7 per share.

E. Maxwell.

Philadelphia, 12, 7, '64."

This paper was given in evidence.

G. O. Beach, the secretary of the Oil Company, testified : that on the 8th of March 1865, there had been issued to Maxwell 10,000 shares of stock all paid by him ; that on the 15th of March Maxwell had transferred 2250 of these shares to Burke ; that within six months after the organization of the company the stock had not at any time been worth from $7 to $10 per share ; the receipt in the book of company to McCartney was December 20th 1864. The books of the company showed the issue of a number of certificates to different persons, viz. : two for 500 shares ; one of 200 shares ; two of 100 shares ; one of 75 shares, and one of 25 shares ; also, receipts to Burke for 2250 shares.    On the surrender of these receipts, certificates in their place were issued ; the money was actually paid on all before the receipts went out ; Burke's shares were on certificates for 900, 600, 500 and 250 shares respectively, all dated January 10th 1865 ; the certificates for the 900 and 600 shares were returned, and one for 1400 shares issued ; which was dated January 15th 1865, in the name of Burke, and trans-

ferred to Maxwell, July 2d 1865: this was given in evidence by the plaintiff.

The plaintiff was offered to testify; he was rejected as incompetent and he then closed his case.

The defendants gave in evidence receipt book, certificate book, receipts of M. R. Burke, and stub end of certificate book, &c.

William E. Smith testified: " I am one of the administrators of E. Maxwell. He died 10th September 1870. In 1862 and 1863 I was in his employ. I used to see him frequently up to the time of his death. Prior to his death Burke was one of his clerks; was bookkeeper and salesman for ten or twelve years. Maxwell was taken sick about the latter part of August. He was also absent from the store some two weeks before that. Bangs conducted the business in his absence. Burke and Bangs were appraisers to his estate. After letters had been taken out I looked at Burke's account in the ledger, and saw he had appropriated money which did not belong to him. The account showed he was getting $1200 per annum. It had been balanced 1st July 1870, and showed an overdraft of $57. I called Bangs's attention to it, and also Bush's. He and I had went down together, and in the meantime Burke had made certain entries in lead pencil (C). I know Burke's handwriting. The charges of cash are July 1st, $57; July 6th, $200; August, $510; September, $455; October, $236; November, $185; December, $357; which made at the rate of $1200 per annum an overdraft of $1400. I was in the habit of seeing Burke every day about this time. I never heard a word about a claim against the estate. My knowledge of the claim was from Burke."

Being cross-examined he testified : " I never had any conversation with Maxwell about Burke's salary. Burke never admitted to me that he had overdrawn his account. Burke was a confidential employee of Maxwell's. He possessed the entire confidence of the firm, and was intrusted with blank checks. I don't know that he concealed the amounts he drew. At any time any member of the firm could tell what he drew. Burke left at the end of 1870. * * * It was not between the 10th and 20th December I first found out about the overdraft."

Charles S. Lockwood testified: " I was a bookkeeper for Bangs and Maxwell until 20th August of that year ; Burke was salesman then. His account in the ledger is in my handwriting; I was in the habit of handing him cash when he requested, and charging him with it in a round sum. While I was there Maxwell had been away from the store some two or three weeks. I had conversations with Burke, and he said he would square up his account. When Burke would ask for money I used to write the amount in a memorandum which was kept in the drawer, and when I charged it off I would deduct the amount. Part of this one list was an

amount of $500 which Maxwell had instructed me to loan Burke. Burke spoke about selling a house which belonged to his wife to pay this off. This was in the spring of 1870. I charged Burke's salary up at the rate of $600 for six months."

Being cross-examined, he testified: "Mr. Bangs was there, and was in the habit of examining the books. The memorandums were mine. I knew how much he drew; I always paid it to him. Mr. Maxwell used to look at the books, and see the amounts."

Being re-examined, he testified: "I took the amount I was to charge up to Burke from him. He said $600. * * * When Maxwell was sick, Bangs was in the east, and Burke had charge of the store. The books were posted monthly."

Aaron J. Smith testified: "I succeeded Lockwood as bookkeeper. I got my information as to how the books were kept from Mr. Burke. I paid money to him from time to time, and put the amount in a memorandum in the drawer. I had no conversation with Burke about his salary. All these entries were in Bangs's lifetime. I was in the habit of balancing cash every day. Any one could learn from me how much cash Burke had drawn at any time. I think I remember giving him a check when he left the employ, and something— a few dollars—out of the drawer. The check was signed by Bangs."

Van Camp Bush testified: "I am one of the administrators. Letters were granted in October 1870. I first learned of the amount drawn by Burke in the latter part of the year, towards the 1st of January. I saw Bangs in regard to it subsequently. I called Burke's attention to it, and told him that the $1400 would have to be collected. Burke replied that if I insisted on the collection of that money he would have oil suits brought against the estate and make it sweat. He said Maxwell told him he might have an increase of salary for three years back—for the years 1868 and 1869 $1500, and for the year 1870 $2000. He claimed that $1400 was the amount which was due him. Up to this time he never made any statement as to his claim. I next remember receiving a note from John P. Owens, and I went to see him. Owens showed me two certificates of stock belonging to Burke, which were numbered 107 and 169. He spoke about oil suits, but didn't give me the name of any other clients. The next step was McCartney's suit, and after a month Burke's suit. I first knew of the guaranty paper a short time before the McCartney suit. Mr. Morgan gave me an order on Fitzpatrick for the books, and I kept them by advice of counsel at his office."

Charles E. Morgan testified: "I was counsel for the administrators of Maxwell's estate, and also of Bangs's; I saw Burke once or twice at the time of the appraisement, and again in February 1871. I received no information as to any claim he had against the estate.

[Burke *v.* Maxwell's Adm'rs.]

I wrote Burke about the overdraft, and he came to my office; I told him that this claim had been put in my hands for collection. Mr. Burke replied that the money was his, and he would not pay it back, and unless I withdrew my claim by one o'clock that day, he would cause oil suits to be brought against the estate, and would make the estate suffer more than the amount of the claim."

Entry " C," referred to in the testimony of W. E. Smith, was as follows:—

" Commenced 1st mo. 1st '68, at $1500 per year for '68,–'69; $2000 for 1870."

They gave in evidence the record of the suit of McCartney against Maxwell's administrators, commenced March 4th 1871; also the record of a suit by the administrators against Burke for the over-draft, commenced February 4th 1871.

The plaintiff, in rebuttal, was offered as a witness and asked:— " Was your claim on account of the sale of 800 shares of oil stock by Maxwell to yourself first put into the hands of your counsel, Mr. O'Neill, before or after the decease of Mr. Maxwell ?" The defendants objected to the qustion; it was rejected by the court and a bill of exceptions sealed.

He was then asked the following question:— " Was your claim against Mr. Maxwell on account of the sale to you of 800 shares of oil stock upon the alleged guaranty put into the hands of your counsel, Mr. O'Neill, prior to your interview with Mr. Bush or Mr. Morgan ?"

He answered, " Yes. At the interview with Bush I told him I had a claim against the estate."

The plaintiff called John F. Goodwin, who testified: "I am a member of this bar. I have been in Mr. O'Neill's office for fifteen years. I remember bringing the suit. Plaintiff had called about it a year before. He used to come very often. I don't know why O'Neill did not bring suit before he did. He used to say, when he called, that he had made a claim against Maxwell, I think. There were other claims like his in Mr. O'Neill's hands, which were settled. Burke used to ask whether he had a case; whether he could recover. He used to say that he had bought the stock at $5 per share, and that Maxwell had guarantied it would be worth $7 per share. He never showed me paper " A" until last winter a year ago. He told me he had often looked for it and could not find it. He gave that as a reason he had not produced it before."

This testimony was admitted under objection by defendants and exception.

All the testimony at all bearing on the decision in the case has been given above.

The court, after referring to the grounds of claim and defence, charged:—

[Burke *v.* Maxwell's Adm'rs.]

\* \* \* " The plaintiff's reply when charged with it was that the dead member of the firm had agreed he might draw as though his salary had been $300 greater for the two years before, and $800 greater during the then current year. And yet all the time while his employer lived, and notwithstanding frequent interviews with his legal representatives after his death, he does not appear to have breathed a word to any of them in regard to this claim of $4000 arising in the alleged guaranty.

" These circumstances make this case what I have designated it, a remarkable case. This case is important as well as remarkable, inasmuch as the claim is against the estate of one who is no longer here with us; of one whose lips cannot be opened to explain any part of the transaction; of one whose arm can no longer be raised to ward off the blow which has been aimed against his property. No one can die with any feeling of security that his accumulations can reach those who are dear to him, if claims, set up years after they have accrued, and only after his death, are sustained by courts and juries without the most rigid scrutiny, without convincing evidence.

" Yet there may be a case of a just claim where the creditor has laid by many years, and yet never made the claim known. Such case, notwithstanding an apparently unaccountable silence, must receive a patient hearing, and, if found to be just, verdict and judgment must follow, though the estate of the dead be swept away.

1. [" The burden of proof in this case is on the plaintiff. It would be on the plaintiff in any event. It would be in any event if an ordinary case. It is much more upon him when the circumstances are so unusual.]

" But what must the plaintiff satisfy you of, in order to recover? He must first satisfy you he bought this stock.

2. [" He must satisfy you he had $4000 to put into it.] Then he must satisfy you not only he bought it, but that it was bought accompanied by the guaranty. These three things proved, your verdict must follow. If the evidence be such as to leave you in serious doubt as to any one of these things, your verdict must be for the defendant.

" A number of facts in this case may almost be taken as admitted without contest. The first is that Mr. Maxwell was certainly engaged in a project to form an oil company, and put off a large number of shares of stock on third parties at a profit. And while the evidence is not perfectly clear on the second point, probably you will not have much difficulty in reaching the conclusion that in doing this he was pursuing the usual mode then pursued. This mode involved efforts which were fair sometimes, and often were not fair. It involved statements of mere opinion, highly colored,

31 P. F. Smith—10

[Burke *v.* Maxwell's Adm'rs.]

that the enterprise could not fail to be a grand success, &c.    Again, there is a third fact about which you can have very little doubt, and that is that Mr. Maxwell guarantied to Mr. McCartney and others that the stock should bring $7 per share within six months. There is still another that I think may be taken as admitted, that he not only guarantied to Mr. McCartney his stock, but he said Burke had bought 800 shares and that he had given him (Burke) such a guaranty as he then gave McCartney.

"Another point seems pretty clear, and that is that this stock never had a market value.    There is still another point, that Mr. Burke was intrusted with receipts for this oil stock.    The prima facies of these receipts was that he had bought that stock and bought it with his own money.

3. ["With all that I have now stated it by no means follows that the important element of the plaintiff's case has been made out; that in point of fact he did buy of Mr. Maxwell 800 shares of the stock and paid him $4000.]    Yet, if he did not do that in point of fact, it matters little how much Maxwell may have stated it, and at the same time it does not justify your verdict.

4. ["McCartney testifies that Maxwell told him that Burke had paid him, and Burke held receipts which would indicate he had bought 800 shares, and a much greater number of shares, and got certificates for the stock.    If these two elements stood alone, if the certificates were for 800 shares, I think you would have no difficulty in reaching a conclusion that plaintiff's contention is right.    But unfortunately, as I view the case, these elements of testimony don't stand alone.    They are accompanied by other facts and circumstances which modify and nullify them, and one of the most important facts is a negative one, that is to say, there is no proof before you, or attempt to prove, that Mr. Burke ever had $4000 to put into the stock..    In an ordinary case it would be obvious you could decide the case with much more satisfaction if it was shown that Mr. Burke had that money at any time.    It is a very patent and pregnant circumstance that the case is presented to you without any circumstance to show where the money came from with which he purchased, if he did purchase, from Maxwell this stock.    The only fact we do have in this connection is against him.    For, years after, when he demanded a larger salary, we find him to have been receiving before only $1200 a year.    We find he had a wife and family depending on him.    A man who only had a wife depending on him might save, but with a family, in these times, it would be rather difficult.    I may say, in this connection, in the absence of evidence to the contrary, you are at liberty to regard your own experience in making inferences from evidence.    As to the matter of salary, you are at liberty to regard your own experience.    If you believe that Burke did not get more than $1200 a year, you might find that he could not well save

[Burke v. Maxwell's Adm'rs.]

much. The absence of that evidence is negative testimony of a very damaging character to plaintiff's case.]

5. [" Again, Mr. Burke's relations to Mr. Maxwell were very confidential. Mr. Burke understood the whole enterprise very well; we may assume he did. We may assume that Burke knew that Mr. Maxwell was not engaged in the enterprise without making a handsome profit, even if Burke did not know the figures. We may ask ourselves, with this assumed knowledge, whether he would have paid a full price which was charged to others in the general market, whether if he did buy he would not have been put on better terms. And yet he claims that he bought not only 800 shares, but paid the full $5 per share.]

[" Again, we may naturally assume that he knew well these transactions of Mr. Maxwell, and was a helper with him. He assisted him to get off these shares. The men whose names you find on the paper were the friends and acquaintances of Mr. Burke. You may assume he made considerable efforts to induce them to subscribe to 2250 shares. We may naturally suspect he was paid in oil stock, and would have taken his chances whether this stock would be worth $7 per share. Under such circumstances he would not be entitled to any guaranty.]

" Again we come to paper 'A.' ·This was introduced into the case by plaintiff, not as evidence as to what the contract was with Mr. Maxwell, but merely as corroborative of McCartney, namely, that Mr. Maxwell did give a guaranty to Burke of the shares he took in the enterprise. The paper imports two things : first, that Burke had bought a certain number of shares ; and secondly, that Maxwell had guarantied to him also.

6. [" Burke admits, as to the guaranty part of it, this paper is a sham.] He does not contend at all that that paper was the paper out of which the guaranty arose. The *narr.* declares he did not rely on this paper, for that alleges a different undertaking, and an undertaking as of a different date. This paper has no mention of the six months in it, but a guaranty that the stock would be worth $7 per share on the organization. The *narr.* is upon a guaranty that it would reach $7 per share within six months.

7. [" If paper 'A.' is without meaning as to the guaranty, is it any use as to the purchase, or proof of the fact that there was any purchase at all?] But did not the paper make it necessary that Maxwell, when applied to by McCartney and other people, should not falsify it by word of mouth ? Did not Burke and Maxwell understand just what the paper was for ? Did they not fully understand one another ? When Maxwell stated to McCartney that Burke had bought, was it not the same sham that the paper itself was ? Is it fair, now, for Burke to set it up as a verity ?

[" Again, I have spoken of the receipts. If the receipts were for just 800 shares it would be better for plaintiff. But, un-

fortunately, the receipts are for 2250 shares, and all transferred to him about the same date. You will ask did Burke buy all these shares? McCartney says nothing about 2250 shares. Paper 'A' says nothing about them. Plaintiff's counsel does not pretend that Burke paid for 2250 shares. You will ask yourselves if this amount was not bought and paid for, were the 800 shares bought and paid for?]

"Again, paper 'A' is for 750 shares, as you will see, and not for 800 shares.

["Again, the receipts which were given to Mr. Burke for payments on this stock are for 900 shares, 600 shares, 500 shares and 250 shares. But by no addition or combination of any of these numbers do we reach 800 shares. Now, these are discrepancies which are unfortunate for plaintiff; discrepancies you are entitled to call for free explanation of at his hands.]

"As to the other of the two things which plaintiff must make out, there will be no difficulty if you decide the first in his favor, if you really believe that Burke did buy and pay $4000, namely, that Maxwell did guaranty him. The battle-ground then is, whether Burke did actually buy these 800 shares.

"So much now for one view of the plaintiff's case. There are still other considerations which involve it in doubt and suspicion. The first is, Burke's long silence in the lifetime of Maxwell. If he had so large a sum as $4000 at stake, it would be reasonable that he would call Maxwell's attention to it from time to time—reasonable that some one, or more than one, who were so laboring with him in that establishment should have heard some reference to this matter between Burke and Maxwell, during a period of more than four years, and concerning so large a sum.

["I do not know how it may appear to you, but it seems to me, under all the circumstances Burke was placed in then and now, that this was a very large sum to him—a sum as to which, if he thought he had any claim, he would not only have appealed to his employer frequently, but would have quarrelled with him outright long before four years had gone by.]

"Again, the loan of $500 from Maxwell, more than six months before his death, is a circumstance clearly irreconcilable with the theory that Maxwell was his debtor for so large a sum. It might be. Counsel for plaintiff has argued before you, with much force and with propriety, in view of the relations existing between them, it might have been very unpleasant to have urged this violently. He might have been reluctant to take the risk of a discharge.

["All that is possible, but it is scarcely the usual course things would have taken. At least in don't seem so to me. If you look at it in the same light, and think it not usual for a person who had such a claim to ask for a loan of $500, and then afterwards speak of repaying it, and cutting it down even at the sacrifice of

selling his wife's real estate, it don't seem to me to be usual. If you find it not usual, you will, of course, regard it with suspicion, as you may regard all circumstances which don't accord with your ordinary experience in life.]   A still graver circumstance has been the neglect of Burke to mention this subject to the administrators. Maxwell died 10th September 1870.   He was under no sort of obligation to them.   There were no relations of trust and confidence between them, nor was he dependent on them for his situation. His claim was against Mr. Maxwell individually; his employment was with Bangs & Maxwell.   And besides all that, the evidence of Mr. Smith is that early in October he was going to leave his situation, and he did leave in December.   October, November and December slipped away without his saying a word about the claim to them.   That certainly you must regard.   There can be very little doubt whether that was usual.   And yet he does not appear to have spoken of this claim until it was finally apparent that the administrators were about to proceed against him for the overdraft of which you have heard.   The argument made with a view to parry the force of the blow as to his silence during his life does not apply to these three or four months after Maxwell died.

"We now come to what I have spoken of as the overdraft.   Undoubtedly, whether he overdrew or not, he was charged with this some time in December.   His explanation you will recollect that Mr. Maxwell agreed he should draw at the increased rate.   [If true, how natural it would have been for him in view of the peculiar circumstances under which he made it, beginning only a little while before Maxwell's decease—how natural it would have been for him to have said then and there, I also have a much larger claim than that, so far as Maxwell is concerned; I have a claim of $5000 growing out of that oil company affair.   I propose pressing it.   I have not acted unreasonably.   It would have been natural for him just at that time to have set up this claim, as well as the allegation that there was no overdraft.]

"Was the explanation of this overdraft true?   Did Maxwell ever promise Burke he should even have the alleged increase? On its face it does not seem very likely.   [Assuming my theory of the case, it does not seem very probable that Burke, who upon the books of the firm seems to have been getting but $1200 a year, should have been suddenly promised by Maxwell that he should draw an increase of salary not only during the current year, but that he should go back and draw for 1868 and 1869 the increase. Such a thing may be, but it is not usual; such of you as keep books can well form your own conclusions as to this matter.   You may know that while it might be not an unusual occurrence for merchants to say you may draw an additional sum, yet that to go back two years beyond the current year is not a very common occurrence.   Upon its face there seems to be improbability as to that

[Burke *v.* Maxwell's Adm'rs.]

statement. It is very obvious too that these promises of Maxwell's could not have been made before the 1st of July 1870, because of the ledger entries then, of which Burke had charge, and which we may be justified in saying he had control of.] On the 1st July, we find the overdraft so far as bookkeeping can show it of $57. It is scarcely probable that would have occurred if Maxwell prior to that time had made the promise. If he had made it, why did he not communicate to his partner? It is not customary for one member of a firm to give away the property of the firm without consulting his fellow member in advance. We have no evidence at all that Bangs ever knew of this. On the contrary, we think the evidence would justify the contrary inference that he did not know.

" [Why did not Burke communicate it to Mr. Bangs? He must have known enough about mercantile business to know that this agreement by one partner was a nullity unless he communicated it. Why did he not communicate it himself to ·Mr. Bangs? It is for you to find the answer to this.] He did not communicate it to either of the bookkeepers. He was obviously drawing what appeared, on the account, to be an overdraft. Mr. Lockwood and Mr. Smith must have been conscious of that. If Maxwell had authorized this increase of salary, he would have given some explanation to these young men. You have the testimony he never said anything about it. There is a lead-pencil memorandum in this ledger. We have the testimony of Mr. Smith that the memorandum was not there when he examined the books the first time, sometime in November or December. Why that memorandum, if Burke did not communicate the fact, and never before thought it necessary to make lead-pencil memorandum? Why make it then, if he did not make it in Mr. Maxwell's lifetime? [The fact as to whether the salary was increased or not, is not important as to the real merits of this case.] For if Maxwell did promise, as he is alleged to have done, so far as it is retrospective it did not bind even himself, because of the entire want of consideration. Upon a promise for increased compensation, after services were performed, Burke could not have recovered even against Maxwell. [The promise was not binding on Bangs, because one member of the firm has no right to give away money of the firm, as this would have been. However you may find this fact, it don't help plaintiff as to the general merits. If false, however, it goes very·far to put an end to plaintiff's case.]

" It is proper to call your attention here to the fact that I have not instructed you as to any matter of law. In all I have said, substantially there is no law, and I am simply giving you my impressions of this case. You are not bound at all by anything I have said. It may be, for want of explanation, I have entirely mistaken the whole subject-matter; that what I have regarded as points being against plaintiff are without force. If, on· consulta-

tion with each other, you reach such conclusion, you may disregard all I have said; all this is for you exclusively. Instructions as to mere matter of fact—as to what the evidence has been, as to the weight of it or inferences it will bear, are all for your consideration. You are the judges of the whole matter."

8. ["You may have noticed that very rarely in the cases brought before you have I instructed you as to facts; I have instructed you as to the law, but left the facts to you. This case, however, is a remarkable one and an important one, and I have deemed it important to present views which, were I in the jury-box, would control me in giving my verdict against the plaintiff.] You are not bound by it; if it don't accord with your own reflections, you may disregard it. I have not been disposed to take the view that this paper was otherwise than genuine. My view is, the paper was written for a purpose, to put off oil stock on parties named in it and other parties to whom it was shown, and that Maxwell and Burke thoroughly understood it. I have no idea that there is any such degree of wickedness in the plaintiff before you as the crime of forgery would involve.

9. [" I think his sole fault consists in using this paper for a purpose for which it was never made. He is using it to give corroboration to another branch of his case. There are a great many degrees of wickedness in the world. I don't think that Burke's wickedness amounts to a capacity for a direct crime, while if my impressions are correct his fault is very considerable.] But whatever my views may be as to the paper, whether it be a forgery or not, the question is for you. The counsel for defendants has chosen to argue upon it, and probably you will deem it proper to give it some consideration. As far as the law is concerned, you may reach your conclusions by comparing the signatures which will go out with you, which are genuine, with this particular signature. I looked at the signature at an early stage of this case, and compared it with signatures produced by defendants. And since the case has closed I have examined the signature produced by plaintiff. I must say as mere matter of curiosity, there is one thing very remarkable about that signature. You will find the " e" in all the genuine signatures in whatever shape he may make it—you will find the " e" always fairly developed, but here the " e" seems entirely omitted. But still that is mere matter of curiosity in this case. I cannot believe myself that that paper is a forgery. Should you conclude that plaintiff's claim for $4000 is a good one, you will have probably to deduct the $1400 and interest upon it—your verdict will be for plaintiff for that much less.

10. [" But should you find against plaintiff as to the oil stock guaranty, you will have still to consider the question of set-off, and if you find there was an overdraft of $1400, you will have

[Burke *v.* Maxwell's Adm'rs.]

to find not merely a verdict for defendants, but will find due them so much as the overdraft amounts to.]

"Whether there was an overdraft in fact I do not propose to argue, though I have a very decided opinion as to it. The case is in your hands."

The verdict was for the defendant with certificate of indebtedness from the plaintiff of $1702.40.

The plaintiff took a writ of error ; he assigned for error,

1. The portions of the charge in brackets.

2–10. The parts of the charge in brackets, numbered respectively from 1 to 9.

3. The part of the charge in brackets numbered 10.

*J. G. Johnson*, for plaintiff in error, as to the extent of the judge's power in charging, cited Insurance Co. *v.* Halden, 12 Johns. 513; Dittmars *v.* Commonwealth, 11 Wright 337; Mohney *v.* Evans, 1 P. F. Smith 84; Ralston *v.* Groff, 5 Id. 278.

*C. E. Morgan, Jr.*, and *G. Junkin*, for defendants in error, as to set-off of partnership debt against an individual claim against one partner, cited: Tustin *v.* Cameron, 5 Wharton 379 ; Smith *v.* Myer & Aber, 10 Harris 36 ; Solliday *v.* Bissey, 2 Jones 347 ; Wrenshall *v.* Cook, 7 Watts 464; Silberburg *v.* Pincus, 6 Phila. 533.

Mr. Justice PAXSON delivered the opinion of the court, March 13th 1876.

The right of a judge to express an opinion upon the evidence has been recognised in a number of cases. In Dittmars *v.* Commonwealth, 11 Wright 335, it was said by THOMPSON, J.: "It is not error upon the part of the court to express an opinion merely upon the facts of the case, if they are properly referred to the jury. It is often very proper to do so. It aids the jury and subserves the ends of justice. Care must always be taken, however, not to infringe the province of the jury, so as to relieve them from the full responsibility of pronouncing an intelligent judgment upon them for themselves." The judge has a right to aid the jury by an expression of his opinion upon the effect of the evidence, but not so as to mislead them, or control their deliberations: Mohney *v.* Evans, 1 P. F. Smith 84; and it must be done in such a manner as not to be one-sided or unfair: Ralston *v.* Groff, 5 P. F. Smith 276. The learned judge who tried this case in the court below went far beyond any recognised rule in his discussion of the evidence. It may very well be that he regarded it as a case which, to some extent, justified him in influencing the jury. But even if such were his view, he went too far. There can hardly be a doubt but that his charge controlled the jury. It is true that near its close he told them that they were not bound by his views, and might

[Burke *v.* Maxwell's Adm'rs.]

disregard them, yet almost in the same breath he informed them that if he were in the jury-box he would find against the plaintiff. This, taken into consideration with the whole tone and tenor of the charge, bore so heavily upon the plaintiff as to leave him scarcely a chance; it was practically controlling the verdict. When there is sufficient evidence upon a given point to go to the jury, it is the duty of the judge to submit it calmly and impartially. And if the expression of an opinion upon such evidence becomes a matter of duty under the circumstances of the particular case, great care should be exercised that such expression should be so given as not to mislead, and especially that it should not be one-sided. The evidence, if stated at all, should be stated accurately, as well that which makes in favor of a party as that which makes against him; deductions and theories not warranted by the evidence should be studiously avoided; they can hardly fail to mislead the jury and work injustice. Tested by the principles I have indicated there was error in the portions of the charge referred to in the first, fourth, fifth, sixth, seventh, eighth, ninth and tenth assignments. We have no doubt the learned judge intended to do exact justice, but he unwittingly stepped over the line. So far from the charge being a calm, impartial presentation of the evidence, some portions of it, at least, went far beyond the evidence; deductions and theories are drawn, which, if not wholly unsupported, should have been left for the jury. I have looked in vain through the testimony for anything to justify such expressions as these: "Again, we may naturally assume that he knew well of these transactions with Maxwell, and was a helper with him. * * * You may assume that he made considerable efforts to induce them to subscribe to 2250 shares. * * * We may naturally suspect he was paid in oil stock, and would have taken his chances, whether this stock would be worth $7 per share." And again: "Burke admits, as to the guaranty part of it, this paper is a sham." Mr. Burke was not examined, and the record utterly fails to disclose any such admission. It is needless to particularize further; similar errors run all through the charge.

There was also error in the instruction contained in the third assignment. It was not essential for the plaintiff to prove that he had $4000 to put in this stock. It was no part of his case. He may have purchased it without the money; a large proportion of the business transactions of the world are based upon credit. The validity of a contract does not depend as a matter of law upon a cash consideration.

We perceive no error in the remaining assignments.

Judgment reversed, and *venire facias de novo* awarded.