132    324
e206   ⁴337

## E. R. NEWHARD ET AL. v. HENRY M. YUNDT.

APPEAL BY DEFENDANT FROM THE COURT OF COMMON PLEAS OF LEHIGH COUNTY.

Argued February 5, 1890—Decided February 17, 1890.
[To be reported.]

1. On the trial of an issue devisavit vel non, the conflict in the evidence, the contrariety of the opinions expressed, and the veracity of the witnesses, are matters peculiarly within the province of the jury, and with them the court has nothing to do: Shaver v. McCarthy, 110 Pa. 339, 347.

2. It is therefore not error to refuse to charge at the request of the proponent that "the testimony of witnesses who depose that the testatrix was of perfect mind and memory, is to be preferred to the testimony of those to the contrary," as quoted from Swinburne, in the opinion of WOODWARD, J., Stevenson v. Stevenson, 33 Pa. 473.

3. No such point was decided in the case cited, and what was meant by the quotation from Swinburne, was probably, if within the law, that testamentary capacity is always to be presumed, and that such presumption stands until overcome by the weight of the testimony impeaching it.

4. In referring to the testimony and to the names of the witnesses, much latitude must necessarily be allowed, in a charge to the jury, and where there is nothing in it that is unfair, or misleading, or that withdraws the facts from the jury, there is no reversible error: Cf. Burke v. Maxwell, 81 Pa. 139; Ditmars v. Commonwealth, 47 Pa. 335.

5. A witness in the present case had testified to sufficient facts to render him competent to give his opinion as to the testamentary capacity of the testatrix. The value of his testimony was another matter, and of that the jury were the proper judges; its admission was therefore not error.

6. The question, whether, because a bond for costs had not been filed before the register of wills within ten days after the appeal was taken, as required by § 2, act of June 6, 1887, P. L. 359, it was error to refuse to dismiss the appeal after the testimony had been closed, was not within the record, and not decided.

Before PAXSON, C. J., STERRETT, GREEN, CLARK, WILLIAMS, McCOLLUM and MITCHELL, JJ.

No. 38 July Term 1889, Sup. Ct.; court below, No. 49 April Term 1888, C. P.

Upon an appeal, pending in the Orphans' Court, from the decree of the register of wills admitting to probate the alleged will of Catharine Newhard, dated November 22, 1884, the testimony upon which it was to be determined whether an issue should be awarded or not had been closed, and on the argument thereof, the counsel for the proponent moved that the appeal be dismissed, for the reason that security for costs had not been given before the register, within the time limited by the act of June 6, 1887, P. L. 359. On March 5, 1888, the court, ALBRIGHT, P. J., filed the following opinion and decree:

Probate of the will was had on July 7, 1887. On July 23, 1887, the register dismissed a petition to revoke the letters, etc. On July 25, 1887, leave of the Orphans' Court to enter an appeal was obtained. On October 14th, the register fixed the amount of the bond for costs and approved the same. This motion to dismiss was made on December 21, 1887. . . . . The excuse for not giving bond in time is, that the laws of 1887 had not been published, and the existence of the statute was not known.

If the principal obligor is given the benefit of his appeal, he could not successfully assert that the bond was void because filed too late. It has been decided that where a recognizance for stay of execution, or a bond in attachment proceedings, was irregularly given, because filed too late, or for other informality, if the party procuring it to be given obtained his stay, or other advantage secured by the giving of the bond, the bond is good upon suit on it for a breach of its conditions.

If the bond were in this court, the court would order it to be filed as of a date contemplated by said act. But, it is before the register; the motion to dismiss the appeal should have been made there. And it can be taken that proponent, by delaying objection to the bond, while appellants took much testimony (proponent's counsel cross-examined the witnesses) has waived the irregularity. No benefit could accrue by the register's dismissing the appeal. It could at once be entered again, the bond again filed, and the court would thereupon receive the testimony already taken. Proponent has a good bond; that ought to satisfy him. As to the main question,

Statement of Facts.

the decision of Knauss's App., 114 Pa. 10, plainly entitles the appellants to a jury trial of the questions set forth in the petition.

March 5, 1888, the motion to dismiss the appeal is overruled; the order for an issue prayed for will be made; counsel may prepare and present it.

—Thereupon it was ordered that an issue should be framed and a precept be directed to the Court of Common Pleas to try the questions following:

1. Whether or not, Catharine Newhard, on the 22d day of November, A. D. 1884, was possessed of a sound and disposing mind and memory, and, whether or not, she had on said day, sufficient mental capacity to make a last will and testament.

2. Whether or not, the making and execution of the alleged last will and testament, dated the 22d day of November, A. D. 1884, of the said Catharine Newhard, was procured to be made by undue influence, fraud and imposition, practiced upon the said Catharine Newhard, deceased; and that in the said issue, Ephraim R. Newhard, and the other contestants named, should be plaintiffs, and Henry M. Yundt, executor and sole legatee named in the said alleged last will and testament should be defendant.*

The said precept having been filed in the Court of Common Pleas, and issue duly joined in the form directed, at the trial on January 25, 1889, the plaintiffs called Eli Diehl, who testified that from the spring of 1885 he worked for Henry M. Yundt for one year, living upon his farm and taking his meals at his house; that during that year he saw Catharine Newhard every mealtime, and talked with her frequently; that she was an old lady, physically weak, and had a doctor once and awhile; had a sore leg, and was forgetful, the witness describing many of her peculiar doings.

Q. Taking into consideration all that you saw Catharine Newhard do and all that you heard her say, her feeble condition, and from what you know and saw her doing that year you lived at Henry M. Yundt's, in your opinion had she sufficient mind and memory to take care of herself and manage her own affairs? A. No, sir.[7]

---

* See Palmer's Est., ante p. 297.

Charge of Court below.

The testimony having been closed on both sides, the court, ALBRIGHT, P. J., charged the jury, in part, as follows:

The law has declared how much mind is to be required in a person to make a valid will. Witnesses are not instructed as to that, and probably do not know it, and their opinion is more valuable when it is directed to the question of what they think of the soundness of mind of the person, than when they express an opinion as to whether she had mind enough to make a will. Now, it is alleged by the plaintiffs that Catharine Newhard, owing to disease and old age had lost the mental faculties necessary to make a will. It is alleged that she at one time had a perfect mind and good sense, but that owing to disease and growing age she lost her mind in part. It has been testified, and is no doubt true, that about 1872 she had a severe attack of typhoid fever, and that in July, 1881, she fell down outside of the house and was unconscious, and that she was sick from that time on for some time, and possibly had other attacks of sickness while she was at Newhard's; and also that she was sick while at Yundt's, both before and after the will was made. At this point I will call your attention to the dates, as I have them down, when Dr. Martin attended her. . . . .

Now, it is alleged that after the fever her mental condition grew worse; that she became more forgetful than she had been; that she became suspicious and had certain delusions or hallucinations, and that this grew worse after the apoplectic stroke in July, 1881; that during the time she was at Newhard's she behaved in a way different from what a rational person would; that she blamed the members of the Newhard family, her brother, Henry Newhard, and Francis and his wife, and I believe, some other members of the family, with stealing her money from time to time, and this was a frequent complaint. It is assumed by the plaintiffs, that as there is no evidence from which you could find that these charges were true, that they were unfounded; and it is said that Catharine, on various occasions after she had made these accusations, admitted that they were not true and asked for forgiveness. From this it is argued that you can find that her mind was impaired, that she took a wrong view of things and had delusions. It is also alleged, that she became irritable towards

Charge of Court below.

the last when she was at Newhard's, and was unreasonable; that she spoke a great deal to herself, both at night, in bed, and during the day time, saying various things and among others that her money was being stolen; that she had in her sounder years been of cleanly habits, and she afterwards became filthy, and she could not control the discharges from her bowels on various occasions, and was careless in that regard and behaved peculiarly; that on one or more occasions she left her room undressed and came down stairs and thought she was dressed; and in various ways it is claimed that it has been shown that her mind had given way and that she had not the mind necessary to make a will; that she could not form an idea of her possessions and of the natural recipients of her bounty, and could not do other things which, according to the rules of law, are necessary to enable one to make a will. In that particular it has also been testified that she had difficulties with or made charges against persons to whom she had loaned money.

It would appear that the whole estate of this old lady was in money which was mostly out at interest among the neighbors. It is said her estate was from $4,000 to $5,000, and that among others, Nathan Eberhart had $2,000 of her money from about 1870 down to the time after she made her will, at Yundt's. It appears he paid her the interest every year, about the latter part of March; it fell due about the first of April, and I suppose, from what has been said in this case by Nathan Eberhart and others, that there is no question but that he dealt honestly with her and that she knew that. [It has been testified that on one occasion after Nathan Eberhart had paid her interest that she found fault with him, alleged something wrong about the interest, I believe, at least said he was a rascal or a rogue, and it is claimed by the plaintiffs that this was a mistake and it was not true, and this, among other circumstances, is relied upon to show that she had lost her mind in part.] [2]

Then, as I said, several witnesses, DeLong and Diehl and perhaps others, testified on the plaintiffs' side as to what they had seen of her at Yundt's, and they say they noticed certain peculiarities about her then. She was at Yundt's from May, 1882, until June, 1887, when she died, nearly five years. Many witnesses have been called who have testified as to her

Charge of Court below.

condition there. Some persons told us that they had had
opportunities of observing much of her at that place, and Mrs.
Yundt and Henry M. Yundt, of course, observed much of her
and probably saw nearly all she did, or heard a good deal of
what she said in her waking hours. Mrs. Yundt has given us
a description of Catharine's condition, and Mrs. Yundt, Sr., it
seems, knew a good deal about her for a number of years, and
she has told us what she knows. And Mrs. Troxell, the sister-
in-law of Mr. Yundt, and certain young men, who lived in the
family of Mr. Yundt as servants, have told us a good deal
about what they observed of her. Then there are a number
of persons, who saw her occasionally, some of them often, and
they have all told us that she was old and feeble; as a conse-
quence of that, her eye-sight was dim, and they have detailed
a number of circumstances, showing, in the estimation of the
defendant, that she had the ordinary sense and judgment and
memory which people have, especially of her years, who are
still of sound mind, and have all expressed opinions that she
was of sound mind in 1884, and even all the way down to the
time of her death. . . . .

The question is, and it may be well for me to repeat it,
whether at the time this will was made Catharine Newhard
had a full and intelligent consciousness of the nature of the
act she was engaged in. That is, a full and intelligent under-
standing that she was about disposing of her property by her
last will; that she knew what property she had; that she
understood what she intended to do with it, how to dispose of
it by her will and to what persons, and had a knowledge of the
persons she intended should have it; that she was able to
choose and decide with understanding and reason as to whe-
ther she would dispose of it in one way or the other; practi-
cally, whether she would give it to Henry M. Yundt or whe-
ther she would give it to her brothers and sisters and relatives,
or some of them. Had she mind, memory and understand-
ing to that degree? If she had not, then you will find for the
plaintiffs, and the will will be set aside. If she had, then you
will say that she was capable of making a will and will find for
the defendant, and in that event the will stands. . . . .

It strikes me, gentlemen of the jury, but it is altogether a
matter for you to decide, that there is one witness in this case

whose testimony is of peculiar importance, provided that you believe that he knew what he was speaking about and told the truth. There is, according to my mind, a contradiction between the witnesses who testified for the plaintiffs as to Catharine Newhard's condition while she was at Newhard's up to May, 1882, and those who testified for the defendant as to her mental condition afterwards. [Speaking in a general way, it is probable that you might conclude that, from what the plaintiffs had shown of her condition at Newhard's, she was not of sound mind and had not sufficient mind to make a will;] [3] and it is probable that you would say from the defendant's testimony of her condition while at Yundt's, that she was perfectly capable to make a will, and that there is hardly a question of her mental capacity. Now this contradiction exists. Whether it is owing to the fact that certain witnesses who know better do not want to tell the truth, either from prejudice or self interest, on the one side or the other, or whether owing to prejudice and sympathy they have suffered their testimony to be warped so that they do not tell the truth; how this is, it is not for me to say, and I do not know, but it strikes me that this contradiction exists.

Now gentlemen, is there any way of solving the problem thus presented? Is there any safe and reliable way by which you can detect the state of mind of this woman while she was at Newhard's up to May, 1882, and her condition afterwards? From what has been told you, do you believe that her mental condition grew better or that it grew worse? There is such a thing undoubtedly, as a person being of unsound mind, and even insane, and afterwards becoming restored. It might be that a person of 1881 and 1882 had been of unsound mind, even a raving maniac if you please, and in 1884, he or she might have been perfectly sane and able to make a contract and make a will. Was it the case with Catharine Newhard? Did she improve so that you could reasonably and justly decide and infer that she was of weak mind in 1881 and 1882, and in 1884 her condition was improved and she was sane and had mind sufficient to make a will? What was the nature of her ailment, and did that affect her mind? How did it affect her mind? Was it an ailment that could be cured?

[It seems to me that the testimony of Dr. Thomas Martin is

Charge of Court below.

worthy of your closest attention and consideration. You are
to consider him the same as any other witness, as to whether
in your estimation he tells the truth, whether he is willing to
say precisely what he remembers and believes, or whether he
is an adherent of one side or the other; and also as to
whether you believe that he knows what he testifies about.
Is Dr. Thomas T. Martin, in your estimation, a skilful and
experienced physician; is he a truthful man; is he fair and
disinterested in his testimony? I see no reason why you
should not assent to all that; I see no reason why you should
suspect his knowledge or his recollection as to whether he
testifies to things positively, or that he is prejudiced one way
or the other. But it is not for the court to decide whether a
witness is to be credited or not, or what weight is to be at-
tached to his testimony. But is it not true, gentlemen of the
jury, that if his testimony is reliable that then we have the
fact that Catharine Newhard, about 1881 or before, had an
attack of softening of the brain? Then is it not true, as the
doctor says, that softening of the brain is incurable and the
longer it progresses the worse it grows; and is it not true that
she died of that in 1887? He so testifies. If that is so, and
if it is true, as Dr. Martin testified and as Dr. Herbst who
knew nothing of this old lady but who gave his opinion as phy-
sician and an expert, testified, that softening of the brain affects
the mind, reason and probably the judgment and the memory,
then what weight are you to attach to the testimony of Dr.
Thomas T. Martin? Would that then show that in 1884,
when she made the will, more than two years after she went to
Yundt's, that she was better than she had been while at New-
hard's? Would it tend to lead you to believe that the wit-
nesses who testified to her condition in 1884 and while she was
at Yundt's, perhaps were mistaken or did not tell the truth; or,
on the other hand, would you disbelieve the witnesses who testi-
fied to her weak condition mentally while she was at Newhard's?
Was this woman afflicted with softening of the brain? Did it
commence about 1881, at the time she had the apoplectic stroke,
so called? Dr. Martin said that that was so, and that it con-
tinued down to the time of her death; that it was an incurable
disease and grew worse. Is that so, in your estimation? If it
is, then it is probably true that generally speaking the descrip-

Charge of Court below.

tion of her mental condition, her weak mental condition at Newhard's, was also true, as the witnesses testified to. And then it might be the fact that her condition, in point of mental capacity, was not quite as good, not quite as strong, as some witnesses say it was after she was at Yundt's in 1884, and on down to her death. Some witnesses, while the old lady was at Newhard's and while she was at Yundt's, observed her from day to day and no doubt almost every day. For instance, Mrs. Newhard; possibly the girl, the adopted daughter, who was in the house the last few years she was there; Mrs. Yundt, while she was at Yundt's; and possibly some other witnesses, and of them of course it cannot be said that they had no chance of observing her. The attending physician who attended her on so many occasions, as he has stated, from 1881 down to 1887, was also, to a great extent, conversant with her condition. He saw her on many occasions. His mission was to attend to her physical health; but, I suppose, it is true, that while a doctor is diagnosing the disease of a patient with a view of affording him relief and assistance in a physical way, that he also observes the state of mind of the patient, at least to some extent; he naturally talks with his patient, listens to his statements of his ailments and complaints, and that experience it seems Dr. Martin had, and he expresses the opinion that she was of unsound mind. That opinion, of course, you are to regard according to the same rule as the opinion of any other witness who is not a physician; that is, you are to give it much or little weight in proportion to the opportunities, many or few, that he had of seeing and knowing this person, and then the soundness or unsoundness of his judgment in forming an opinion. But I repeat, that if the testimony of Dr. Martin is fully credited by you, in my opinion it has a strong influence upon this case, and furnishes one method, possibly, of deciding which statements relative to the mental condition of this old lady are to be given most credit.] [4]

The court has decided that there is no evidence here from which you could find, if this old lady was of sound mind, that she has been unduly influenced by the defendant. The circumstances of the making of the will and what was done at and about that time, and the disposition she made of her property, are circumstances which the jury may consider as bearing

Charge of Court below.

upon the question of testamentary capacity. She had brothers and sisters, and nephews and nieces. She gave all the property to Henry M. Yundt. But she was living with Henry M. Yundt. . . . .

Bearing that in mind, gentlemen, does the disposition which Catharine Newhard made of her property, and the manner in which she disposed of it, tend to show that she was weak minded and had not testamentary capacity. When a person makes his or her will, that will take effect only on the death of the maker or testator; and any time after the will has been signed a person who makes a will can recall it and tear it into pieces, throw it into the fire, and can make another will, and the last will govern. He has entire control of the will and entire control of the property he disposes of by the will. He can give to one person to-day and if he changes his mind next week he can give to another, and no one can say nay. So, [Catharine Newhard, so far as she by her will gave all her property to Henry M. Yundt, had the power to change the provision. But it seems she did more than that; it seems as to the bulk of her estate she gave it up to Henry M. Yundt at the time she made the will, or before. The bond which Henry made recited that she delivered up to him his note for $1,540; that she had assigned to him the note of Nathan Eberhart for $2,000, and that assignment made it his property. So, at least $3,500 of her property was given to him before and on that occasion. The object evidently was that she would be maintained by Henry as long as she lived.

Henry M. Yundt entered into an obligation to maintain her, and that made it a duty on his part, but yet it cannot be said that it absolutely secured the old lady; it was not made a condition in the deed of any property so that it attached to the land; there is no judgment or mortgage given to secure that promise to maintain her; there was no agreement or covenant made to be recorded so that it fastened itself to the farm or any other piece of land. All she had was Henry M. Yundt's promise to keep her, and if he remained solvent she could at any time have sued him if he failed to maintain her. But he says he gave judgments and mortgages which became liens on his farm, and if Henry M. Yundt had become insolvent in the lifetime of Catharine Newhard, she would have had a claim

against him amounting to the debt, but could not have obtain-
ed the money she had given him. Is it not true that the
transaction to which I have made reference amounts to about
this, that she paid him $3,500 in advance, upon his promise to
board her and keep her in sickness and in health, and for it
she obtained his promise, his bond,' which made it his personal
debt and nothing more ?

Gentlemen of the jury, if Catharine Newhard was a person
that was, in her best years, careless of money matters, liberal,
open handed, reckless, then it would be perfectly natural that
she should make an arrangement of this sort at the time she
did. But if she was a person that was close and careful of
her money and was particular about getting the full value of
all that was paid for, and looked to her money jealously and
carefully, as the only means of keeping her from want, then is
it not true that this was a strange transaction for her to make?
Would Catharine Newhard, at the time you first knew of her
and when she was undoubtedly of sound mind, say in 1869,
or 1870, have made an arrangement of this kind?] [5] It may
be that she would not have done so, and she might still do so
in 1884. She may have grown more liberal or she may have
been satisfied with Henry Yundt's personal obligation, and
then the transaction would bear nothing conspicuous about it.
But if in connection with all the other testimony in the case
bearing upon her mental capacity, both for or against it, you
consider that this transaction is some evidence of failing mind
and some evidence tending to show that she was not, on the
22d of November, 1884, of sound and disposing mind, then
you can regard this piece of evidence, and otherwise not.

The plaintiffs request the court to charge you :

1. Testamentary incapacity does not necessarily suppose the
existence of insanity, so-called. Weakness of intellect from
extreme age, from great bodily infirmity, or from intemperance
to the extent of disqualifying a testator from knowing and
appreciating the nature, effect and consequences of the act he
is engaged in, is as much testamentary incapacity as raving
madness. If from any cause an alleged testator is so enfeebled
in mind as to be incapable of knowing the property he pos-
sesses, of appreciating the effect and disposition made by him
of it, and of distinctly understanding to whom he intended to

bequeath it, he is without the testamentary capacity required to make a valid will.

Answer: Affirmed.

The defendant requests the court to charge you:

1. The plaintiffs are the persons who contest the will; they allege testamentary incapacity. Testamentary capacity is the normal condition of one of full age, and the affirmative is with the plaintiffs who undertake to call it in question, and this affirmative must be established not in a doubtful but in a positive manner.

Answer: Affirmed.

5. In a single will, like the one under consideration, less mental capacity is sufficient to execute it, than to make a contract or to transact ordinary business; but little reflection and memory is required.

Answer: An affirmative answer under the evidence in this case might mislead. It is answered in the negative. The fact that a testator gives all to one person and makes him executor, thus making the will short, is no warrant for saying that less capacity is requisite than would otherwise have been the case.

9. Mere weakness of intellect, eccentricities, or peculiarities springing from such weakness, do not incapacitate, unless they evince an inability to make a reasonable disposition of property, and to understand the nature and solemnity of the act of testamentary disposition.

Answer: Affirmed.

12. Neither age nor sickness, nor extreme distress nor debility of body, will affect the capacity to make a will, if sufficient intelligence remains; the failure of memory is not sufficient to create the incapacity, unless it be total or extend to his or her immediate family or property. The failure of memory may exist to a very great degree, and yet the valid power of the understanding remain.

Answer: Affirmed.

14. The testimony of the witnesses who depose that the testatrix was of perfect mind and memory is to be preferred to the testimony of those to the contrary.

Answer: Under the facts in certain cases this rule might properly be applied: Stevenson v. Stevenson, 33 Pa. 469, but

it cannot be laid down as a rule to govern the testimony in this case.   The point is negatived.[1]

—The jury rendered a verdict, on the issue whether or not Catharine Newhard, on November 22, 1884, was possessed of a sound and disposing mind and memory, and, whether or not she had on said day sufficient mental capacity to make a last will and testament, in favor of the plaintiffs, the contestants. A rule for a new trial having been discharged, judgment was entered on the verdict, when the defendant, the proponent of the will, took this appeal, specifying that the court erred:

1. In the answer to defendant's fourteenth point.[1]

2–5. In the parts of the charge embraced in [   ] [2 to 5]

6. Throughout the entire charge, in rehearsing and reciting with great particularity the facts and circumstances alleged on the part of the plaintiffs, to prove unsoundness of mind of the testatrix, whilst in no part of the charge is particular mention made of the facts proved by the defendant, or the plaintiffs' witnesses on cross-examination, showing mental capacity sufficient to do business, and to make a valid will.

7. In the admission of plaintiffs' offer.[7]

8. In granting an issue devisavit vel non in this cause, bail not having been entered at the time of the taking of the appeal from the probate of the will, nor within ten days thereafter, as required by the act of June 6, 1887, P. L. 359.

*Mr. Arthur G. Dewalt* (with him *Mr. Milton C. Henninger*), for the appellant:

1. In Stevenson v. Stevenson, 33 Pa. 473, this court said: " He may not have been able to specify every part of his property, or name every one of his kindred, but was he competent to form the resolution and purpose expressed in his will?    That was the precise question to which the attention of the jury should have been singly directed; and, says Swinburne, page 78: ' If some witnesses do depose that the testator was of perfect mind and memory, and others depose the contrary, their testimony is to be preferred, which depose that he was of sound memory; as well for that their testimony tendeth to the favor and validity of the testament, as for that the same is more agreeable to the disposition of nature, for every man is a creature reasonable.'   This observation is especially applicable to a

case where the subscribing witnesses, and all who saw the testator the morning the will was made, concur in regard to his competency and give reasons for their opinion that seem entitled to great weight." In the case before us, the subscribing witnesses both testified that the testatrix was competent; a greater number of witnesses, equally as truthful as those for the plaintiffs, of character unimpeached and with opportunities as great for observing as any for the plaintiffs, testified to the same effect, and yet the learned judge nullified the well-settled rule of law, and said it is not applicable.

2. This court has so often declared that the biased or partial presentation of the testimony in a cause is error, that it seems the affectation of learning to cite cases in confirmation of that view, but a few references will be made : Shaver v. McCarthy, 110 Pa. 347; Penna. Canal Co. v. Harris, 101 Pa. 92; Burke v. Maxwell, 81 Pa. 152; Reichenbach v. Ruddach, 127 Pa. 564. A dozen witnesses were called by the plaintiffs, and of this dozen four were of the family of the contestants, and many of them employees or former employees of the contestant, Francis Newhard. It is true, most of these express the opinion that the testatrix was of unsound mind; but, on the other hand, sixteen witnesses equal in intelligence, character and opportunities for observing the testatrix were called by the defendant and all of these say she was competent to make a will. But why burden this argument with further detail. A reading of the charge by this court must convince the same that our contention is correct, and that there was such a presentation of this case to the jury as to greatly prejudice the rights of the defendant, and strongly incline the minds of the jury in favor of the plaintiffs.

3. The seventh assignment relates to the admission of the testimony of Eli Diehl. In brief, his testimony amounted to this : He knew her for a year; she was weak and feeble ; she did not walk fast; she walked very slow ; she dragged her feet on the ground; she was forgetful ; sometimes she said something and sometimes she did not know it any more; she said things and then denied them; she left the door open; sometimes she had a bundle which was wrapped up in old rags; she carried this in her pocket; sometimes she would get cross; he guessed you could not hold any conversation with her. And

on this testimony the court allowed the witness to give an expression of opinion as to the mental capacity of testatrix.     Under the ruling of this court in First N. Bank v. Wirebach, 12 W. N. 150, the admission of this expression of opinion was error. The state of facts, testified to by the witness, did not prove or tend to prove any unsoundness of mind on the part of the testatrix.

Upon the eighth assignment, counsel cited: Carr v. McGovern, 66 Pa. 457; Walker v. Graham, 74 Pa. 35.

*Mr. John Rupp* (with him *Mr. C. J. Erdman*), for the appellees:

1. Testamentary capacity must always be presumed until the contrary is shown by the weight of the evidence.     Of course, the burden of proof, in this case, rested upon the plaintiffs.     They were obliged to show by testimony, stronger than all the opposing proofs in the cause, that the decedent, at the time of making the alleged will, did not have testamentary capacity.     So the court clearly instructed the jury; but an affirmance of defendant's fourteenth point as drawn would have been saying, in effect, that if there was a conflict of testimony and any witnesses testified to the decedent's testamentary capacity, there must be an end of the case, no matter how strong, how conclusive the opposing proof might be.     Such is not the law. It is for the jury to say what witnesses are worthy of credit. In Stevenson v. Stevenson, 33 Pa. 469, no such question as is relied upon here arose.     The sentence from Swinburne, correctly understood, means nothing more than that the testamentary capacity of every one must be presumed, and he who alleges the contrary must prove it by the weight of the testimony.     The court was clearly right in negativing the point.

2. Complaint is made that the charge of the court is not a full, fair and adequate presentation of the case to the jury. The right of the trial judge to comment upon the testimony and express an opinion thereon to the jury is unquestionable: Burke v. Maxwell, 81 Pa. 150, if care be always taken not to infringe the province of the jury so as to relieve them from the full responsibility of pronouncing an intelligent judgment for themselves: Ditmars v. Commonwealth, 47 Pa. 335; Mohney v. Evans, 51 Pa. 80; Ralston v. Groff, 55 Pa. 276.     Even an

inaccurate recital or reference to the testimony, in a review of the evidence by the trial judge, is not cause for reversal, unless as a whole it is substantially erroneous and might have had an important bearing upon the view taken of the case by the jury: Collins v. Leafey, 124 Pa. 203. In order to determine whether the charge of the court is in conflict with these rules of law, the charge must be taken as a whole; and a careful examination of the whole of the charge in this case, read in the light of the testimony on both sides, will show that it is free from the objections urged.

3. The seventh assignment does not show that the objection to the question put to the witness was passed upon by the court, nor that an exception was taken and sealed. But, aside from this, the assignment has no merit in it. The opinion of one who has had large means of observation and who is a keen observer of what he sees and hears, is of much greater value than the opinion of one who has not had as large means of observation and is not so keen an observer. And the jury in this case were expressly so instructed. They were expressly told that the opinions of the witnesses were not all of equal value. The opinion of this witness was admissible under the rules of law governing cases of this kind, but its value or the weight to be given to it was for the jury: Bricker v. Lightner, 40 Pa. 199; Dickinson v. Dickinson, 61 Pa. 401; Shaver v. McCarthy, 110 Pa. 339.

The question raised by the eighth assignment is not properly before this court and is not a subject of review here. This is a proceeding to review a record of the Court of Common Pleas. The decree alleged as error in this assignment is a decree in the Orphans' Court, the record of which is not before this Court.

OPINION, Mr. CHIEF JUSTICE PAXSON:

In the first assignment, it is alleged that the court erred in not instructing the jury that "the testimony of witnesses who depose that the testatrix was of perfect mind and memory is to be preferred to the testimony of those to the contrary." The learned judge said, in substance, that the rule indicated in the point might be properly applied in some instances, but would not do for the case in hand. In this he was entirely right. The rule invoked is an extract from Swinburne on Wills, and

Opinion of the Court.

was incorporated into the opinion of WOODWARD, J., in Ste-
venson v. Stevenson, 33 Pa. 473. No such point was decided
in that case, nor has the extract from Swinburne ever been
recognized in this state in the sense now imputed to it. What
was meant by it, probably, is that testamentary capacity is
always to be presumed, and that such presumption stands un-
til overcome by the weight of the testimony impeaching it.
If more than this was intended, it is not law, as it is for the
jury to say which witnesses are the more worthy of credit.
The rule was thus correctly stated by our Brother CLARK, in
the recent case of Shaver v. McCarthy, 110 Pa. 339: "The
conflict in the evidence, the contrariety of the opinions ex-
pressed, and the veracity of the witnesses, are matters pecu-
liarly within the province of the jury, and with which the court
has nothing to do."

The remaining assignments, to the sixth, inclusive, allege
error in the charge of the court. The burden of the complaint,
however, is embodied in the sixth assignment, in which it is
alleged that "the court erred, throughout the entire charge,
in rehearsing and reciting with great particularity the facts
and circumstances alleged on the part of the plaintiffs to prove
unsoundness of mind of the testatrix, whilst in no part of the
charge is particular mention made of the facts proved by the
defendant, or the plaintiffs' witnesses on cross-examination,
showing mental capacity sufficient to do business, and to make
a valid will."

I have examined the voluminous charge with care, in view
of this assignment, and while it is not entirely free from criti-
cism, I do not find in it any such features as existed in the
charge in Burke v. Maxwell, 81 Pa. 139. There are no mis-
statements of the evidence, as there were in that case, nor
were deductions and theories drawn unsupported by the evi-
dence, and which should have been left to the jury; nor were
there any such expressions of opinion upon the facts as would
amount to error, under the authority of Ditmars v. Common-
wealth, 47 Pa. 335, where it was held that it is often proper
for the court to express an opinion upon the facts, provided
care is taken not to infringe the province of the jury. In re-
ferring to the testimony, and to the names of the witnesses by
whom it is given, much latitude must necessarily be allowed in

a charge, and where there is nothing in it that is unfair, or misleading, or that withdraws the facts from the jury, we cannot reverse. We are not prepared to say that either of these defects appears in this charge. If it can be said to lean somewhat towards the plaintiffs, it may be due to the strength of their case.

The seventh assignment might well be dismissed for informality. It has no merit, however. The witness, Eli Diehl, had testified to sufficient facts to render him competent to give his opinion of his testator's testamentary capacity. The value of his testimony was another matter, and of that the jury were the proper judges.

The eighth assignment presents a question that is not in the record.

Judgment affirmed.