**UNITED STATES of America,**
**Appellee,**

**v.**

**Elliott KAHANER, Antonio Corallo and**
**James Vincent Keogh, Appellants.**

**No. 253, Docket 27784.**

United States Court of Appeals
Second Circuit.

Argued March 8, 1963.

Decided April 25, 1963.

On Rehearing May 27, 1963.

See also 204 F.Supp. 921.

Murray I. Gurfein, New York City (John P. McGrath, New York City, Henry G. Singer, Brooklyn, N. Y., Orrin G. Judd, Jacob W. Heller, New York City, of counsel), for appellant James Vincent Keogh.

William W. Kleinman, Eugene Gold, Brooklyn, N. Y., for appellant Elliott Kahaner.

Michael P. Direnzo, New York City, for appellant Antonio Corallo.

William G. Hundley and John F. Lally, Attys., Dept. of Justice (Robert M. Morgenthau, U. S. Atty. for the Southern District of New York, Nathan Lewin, Walter T. Barnes, Philip T. White, Attys., Dept. of Justice, on the brief), for appellee.

Before CLARK, WATERMAN and FRIENDLY, Circuit Judges.

FRIENDLY, Circuit Judge.

Elliott Kahaner, Antonio Corallo and James Vincent Keogh appeal from a judgment of conviction in the District Court for the Southern District of New York upon a verdict after a jury trial, presided over by Judge Weinfeld. The indictment charged that they, Robert M. Erdman and Sanford J. Moore conspired with each other and with six co-conspirators corruptly to influence, obstruct or impede the due administration of justice or to endeavor to do so, in violation of 18 U.S.C. § 1503. The case to which the alleged conspiracy was directed was a charge that Moore and other officers or employees of Gibraltor Amusements, Ltd., had been guilty of criminal concealment of assets in that firm's bankruptcy proceeding in the Eastern District of New York; various overt acts were placed in the Southern District. Trial of Erdman and Moore, the Government's principal witnesses against the three appellants, was severed.

The indictment and trial in this case attracted particular attention because of the identity of two of the appellants—Keogh, a widely known and respected Justice of the Supreme Court of New York for Kings County, and Kahaner, who had served as Chief Assistant United States Attorney and later Acting United States Attorney for the Eastern

District. No suggestion has ever been made that the due administration of justice was in fact obstructed; the evidence does not reflect in the slightest degree on former Assistant United States Attorney Averill M. Williams, who was in direct charge of the prosecution in the Eastern District, or on Judge Leo F. Rayfiel, before whom Moore and the other defendants in that prosecution came for sentencing.

On January 5, 1961,[1] Sanford J. Moore, Sherwood Schwach, Allen Kerner, Alvin Needleman, Jacob Walter Cohen, and Abraham Manacher were arrested in the Eastern District on charges of concealing assets from the trustee in bankruptcy of Gibraltor Amusements, Ltd., a juke box enterprise on Long Island of which Moore had been vice president and principal officer, and the others had been officers or employees. Cohen, who had been a relatively minor employee, had a cousin, Seymour Deutsch, who did accounting work for Dr. Robert Erdman, a Manhattan physician. At the instance of Deutsch and later of Cohen, Erdman communicated some time in January with Kahaner, then Chief Assistant United States Attorney for the Eastern District, who was both a patient and a friend. At this point the evidence diverges. The following statement is drawn from the Government's case, which was based mainly on the testimony of Erdman and Moore—concededly interested witnesses—who received in return for their cooperation not only postponements of trial on their own indictments here but, in Moore's case, a reduction from three years to one in his sentence on the bankruptcy charge.

The Government's claim was that, following the first conversation between Erdman and Kahaner, a plan was devised whereby Kahaner would endeavor to arrange that only two or at most three of the persons arrested would be indicted (these not to include Cohen), and that later, after Kahaner found that the Assistant United States Attorney proposed

[1]. All dates in this opinion are in 1961, when the conspiracy is claimed to have occurred and was later investigated, except in Part III where the dates relate to the trial in 1962.

to seek the indictment of three—Moore, Kerner and Schwach—the plan was broadened, so that, in Erdman's words, Kahaner "would see to it that they [i. e., the men to be indicted] were treated softly by having the case brought before a specific judge in April, for which he [Kahaner] wanted $35,000". After some hesitation Moore accepted the proposal, in part at the urging of Corallo, with the understanding that $15,000 was to be paid before sentencing, and that Corallo would hold the remaining $20,000 until thereafter. Moore and Kahaner first met in Erdman's office on February 21 [2] and Kahaner was paid $5,000 a day or two later. Shortly thereafter Kahaner told Erdman "pressures" were being applied against Moore because of the latter's unsavory background, and suggested that Erdman see Justice Keogh of the New York Supreme Court for Kings County, and enlist his aid. Around the end of the month Erdman went to the chambers of the Justice, who, according to Erdman's testimony, undertook to be of assistance for a monetary consideration, indicating his financial needs on a card he handed to Erdman, later supplemented by a second one, and also talking of a new car. Erdman testified that Kahaner advised him early in March that owing to a change in the assignments of the judges in the Eastern District, the schedule would have to be accelerated so that sentencing would occur in March, and that around March 7 another $5,000 supplied by Moore was paid to Kahaner and the same amount to Justice Keogh. It is established that, on March 9, Moore, Kerner and Schwach appeared before Judge Rayfiel and pleaded guilty, their attorney, Becker, stating that this was against his advice; [3] the sentencing was set for March 30, on which day Judge Rayfiel would still be presiding.

The Government's case, still resting basically on Erdman's and Moore's testimony, continued with a meeting of Kahaner, Moore and Corallo on March 15, at which Corallo emphasized the importance to him of Moore's not being sent to prison; a demand by Kahaner for the balance of the money; a meeting of Erdman, Moore and Kahaner at a Brooklyn coffee shop in the morning of March 29 at which Kahaner was paid an additional $2,500, followed by Erdman's going alone to Justice Keogh's chambers, paying him $17,500 and reminding him that the sentencing was scheduled for the following day; and a telephone call in Erdman's presence from the Justice to Judge Rayfiel arranging to lunch that day and asking that Judge Rayfiel bring with him the probation report on Moore.

Kahaner and Keogh categorically denied everything relating to them which is recited in the two foregoing paragraphs, with the exceptions indicated in notes 2 and 3 as to Kahaner and the following exceptions as to Keogh: The Justice conceded handing Erdman two cards, the first card being an estimate of the costs of renovating his summer home and the second, on his testimony, a request for a loan, but placed the date well after the sentencing and explained these as innocent indications of his financial situation given to a close personal friend. He further agreed that Erdman had come to his chambers on the morning

---

2. This was Erdman's testimony; Moore testified he did not meet Kahaner until March 29. Although Kahaner was in Dr. Erdman's office on February 21, he testified that he was there with a Dr. Feldman, who was to be examined by Dr. Erdman, that he did not see Moore there, and that he was never out of Dr. Feldman's presence, as Dr. Feldman also testified.

3. Becker also testified that he first learned of his clients' intention to plead guilty when he met them outside the courtroom that morning. Assistant United States Attorney Williams testified that a few days earlier Kahaner had informed him that Moore, Schwach and Kerner would plead guilty and, when Williams expressed disbelief, "indicated to me again that they would plead guilty and that they would probably be sentenced by Judge Rayfiel." Kahaner acknowleged telling Williams of the prospective plea; he said this information had come from Dr. Erdman when he was in the latter's office as a patient.

of March 29, but said Erdman was accompanied by Moore and another man. The Justice's testimony was that Erdman introduced Moore as a lifelong friend who was in trouble, and wondered whether the Justice would ask Judge Rayfiel to look at Moore's "background to see whether consideration can be given to him." He thereupon made the telephone call arranging to lunch with Judge Rayfiel, although he denied asking Judge Rayfiel to bring along the probation report on Moore—a point on which his account was corroborated, and Erdman's contradicted, by Judge Rayfiel. At lunch, Keogh brought up the Moore case whereupon Judge Rayfiel said, in Keogh's words, "that Moore was the most culpable, he was the worst offender in a bankruptcy fraud, the like of which he had not run into before, and that he could—whether background or anything else was considered—he could not consider him anything but a very unsavory character," and also that two other federal judges had alerted him of rumors "that everything has been taken care of" in regard to the Moore sentence. Erdman was told of this conversation by Keogh during the afternoon of March 29. It is not disputed that Erdman then informed Moore, who that evening told his attorney, Becker, that he wanted to withdraw his guilty plea.

Justice Keogh also conceded that at Erdman's request he arranged for Erdman to see Judge Rayfiel on the morning of March 30 before the latter ascended the bench to sentence Moore and his codefendants. Judge Rayfiel said that no leniency could be extended. The stenographic transcript shows that when Moore, Kerner and Schwach appeared in court, Becker moved for leave to withdraw their guilty pleas, whereupon Judge Rayfiel remarked that this was "shall I say, very palpable, and I am sure that you know just what I mean"; that after some colloquy, during which Assistant United States Attorney Williams opposed withdrawal of the pleas, the case was placed at the bottom of the sentencing calendar; that a conference was then had in chambers during which Judge Rayfiel said to Becker, among other things, that he believed he had "more information than you have with respect to certain phases of this matter"; and that, on return to open court, the motion for leave to withdraw the pleas of guilty was denied, and Moore, Schwach and Kerner were sentenced for terms of three years, two years and fifteen months respectively.

Beyond this assured core of fact as to what transpired between the lunch of March 29 and the sentencing on March 30 lie great areas of controversy. There is a sharp conflict whether or not the account given by Keogh to Erdman included the prospective sentences, Erdman and Moore saying that it had and Keogh denying this, a denial supported by Judge Rayfiel's testimony that he had not imparted this information to Keogh. There is likewise conflict whether the appointment for Erdman to see Judge Rayfiel was made by Justice Keogh in the afternoon of March 29, as Erdman asserted, or on the morning of March 30, as Justice Keogh and Judge Rayfiel testified. Moreover, Erdman, and Becker as well, testified that *after* Erdman's interview with Judge Rayfiel early on March 30 they went to the chambers of Justice Keogh; Erdman testified that he reported his lack of success with Judge Rayfiel and asked Keogh to call the Judge again, whereupon, according to Erdman, Keogh picked up the telephone and apparently did so; Becker, who said he was excused from the room for most of the time that Keogh and Erdman were talking, testified that while he was inside it, Keogh told Erdman, "Go see him again." Erdman and Becker testified that they then returned to the Federal Building where, according to Erdman, he visted Kahaner and accompanied the latter to Judge Rayfiel's chambers, which Kahaner entered, saying he would ask the judge's secretary to tell the judge that the Government would not oppose withdrawal of the guilty plea and saying also he would tell Assistant United States Attorney Williams not to fight the withdrawal.

This version was corroborated to some extent by Moore but was rather inconsistent with Becker's testimony that after his visit to Judge Rayfiel's chambers, Erdman said "Please don't make a motion to withdraw the pleas." Kahaner denied going to Judge Rayfiel's chambers or otherwise participating in the events of the morning of March 30; and Justice Keogh denied any participation save for then calling Judge Rayfiel for an appointment for Erdman, at the latter's request and in Becker's presence—this being the only call made by him to that end.

According to Erdman and Moore, there were several meetings of the defendants in April, in the course of which Kahaner, among other things, suggested that the situation might still be saved or at least ameliorated by an offer of restitution from Moore. Justice Keogh and Kahaner agreed that they lunched with Erdman on April 5, but testified this meeting had been arranged before the sentencing—a fact substantiated by Kahaner's telephone record—for the purpose of enlisting the Justice's aid in a project to have Kahaner continue for some time under the newly appointed United States Attorney, and that Moore's case was not discussed. The concededly disinterested testimony of Joseph Jaspan, the attorney for the trustee in bankruptcy of Gibraltor Amusements, Ltd., provides a thread through the events of April and May. Jaspan was in Justice Keogh's court trying a case the latter part of April, saw Moore sitting there, and approached him during a recess. Moore said he was about to apply for a reduction in sentence and was prepared to pay in restitution $50,000 in notes endorsed by Erdman; he asked whether if such payment was made, Jaspan or the trustee, M. Hallsted Christ, "would go to Judge Rayfiel and make a plea for him." After further discussion with Moore on April 27, Jaspan was back in Justice Keogh's court on this other matter early in May; the Justice called him to the side-bar and inquired as to "what was happening" in the Gibraltor case, saying that Erdman was his physician and friend. Later the Justice's office requested Jaspan to attend a meeting in chambers on May 22; upon arriving there, Jaspan found, in addition to the Justice, Moore and Erdman, whom the Justice introduced, and Louis Forman, a business associate of Moore's. The Justice inquired what was happening in regard to the proposed settlement in Moore's case. Jaspan answered that the trustee was prepared to recommend acceptance of $50,000 in notes endorsed by Erdman, but that he "had no way of knowing whether this would help them in the matter before Judge Rayfiel," and that the offer must not be conditioned on a reduction of sentence, with Justice Keogh also emphasizing this. On May 31, Moore, whose application for a stay pending petition for certiorari from our affirmance of Judge Rayfiel's order denying leave to withdraw his guilty plea, 290 F.2d 501, had just been denied, delivered to Jaspan a check signed by Erdman for $1,000, and a series of notes, twenty-four for $1,000 and one for $25,000, made by Moore and endorsed by Erdman; he asked Jaspan to inform Judge Rayfiel of this. After an unsuccessful attempt to communicate with Williams, who, it was learned, had severed his connection with the United States Attorney's office, Jaspan called Judge Rayfiel for an appointment; the Judge was willing to make one only if a representative of the United States Attorney was present, and suggested that Jaspan call Kahaner, the Chief Assistant. After being referred by Kahaner to Kreindler, the chief of the Criminal Division, without result, Jaspan again called Kahaner, who agreed to attend, and also Becker, who had prepared the offer of restitution. When the three lawyers appeared before Judge Rayfiel that afternoon, Becker said he intended to apply for a reduction of sentence because of the restitution and wished to know whether an oral application would be entertained; Judge Rayfiel said it would. Kahaner raised the point that a petition for certiorari to review this Court's affirmance of the adjudica-

tion in bankruptcy, In re Gibraltor Amusements, Ltd., 291 F.2d 22 (2 Cir.), cert. denied, Gibraltor Amusements, Ltd. v. Wurlitzer Co., 368 U.S. 925, 82 S.Ct. 360, 7 L.Ed.2d 190 (1961), was pending, and questioned whether the application for a reduction of sentence should be entertained unless the petition were withdrawn. The Judge said that the defendants should surrender on the following Monday as scheduled, but indicated that he would then continue bail pending a hearing on the application for reduction of sentence.

To the framework afforded by Jaspan's evidence, Erdman and Moore annexed much testimony as to markedly greater interest and participation by Justice Keogh in the settlement negotiations. In particular they claimed he had reviewed a draft of the settlement offer and insisted on eliminating a condition as to reduction of sentence—but with a remark indicative of further conversations with Judge Rayfiel that would make this damaging to Keogh rather than the reverse. Justice Keogh, while conceding that he had a discussion with Jaspan at side-bar and that a meeting was had in his chambers on May 22, denied participating in the meeting, making any remark about Judge Rayfiel or ever seeing the latter; to the extent that he conceded taking some interest in the settlement negotiations, he attributed this to his friendship with Erdman. Kahaner denied any participation save the telephone calls from Jaspan and his appearance before Judge Rayfiel on May 31. Corallo was not implicated in this phase of the alleged conspiracy.

█ The foregoing account, rather long as it has turned out to be, is skeletonized in the extreme and is intended only to afford the background needed for understanding the points raised on this appeal. Moreover, the summary leans in the Government's direction, since on appeal from a jury's verdict in a criminal case we must, in considering the evidence, take "the view most favorable to the Government", Glasser v. United

States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Thus our outline has not included much evidence adduced by defendants, which tended to discredit Erdman's and Moore's testimony in essential respects, although some of this will be mentioned below.

█ Every criminal case imposes special responsibilities on judges. These are enhanced when there is a sharp conflict in the evidence and the Government's case depends in large part on the testimony of persons who admit guilt of the crime with which the other defendants are charged. The responsibilities become greater still when the case threatens the deprivation of life or, as here, imperils much that makes life worth while—in one instance a reputation built over 37 years of public service and culminating in judicial office, and in another a young lawyer's promising career. Yet we must say also that the offense here charged—an attempt to interfere with the administration of justice—strikes at the very foundation of government, and that the high position in the community held by one of the defendants, and the role of another as a federal prosecutor, would aggravate the offense—if it occurred. The institutional arrangement of power made by our Constitution leaves such awesome questions of guilt to be determined, not by trial or appellate judges, but by a jury of laymen, with the Government having the appropriately heavy burden of convincing twelve men or women of the guilt of each defendant beyond a reasonable doubt. If the evidence was sufficient to warrant submission to the jury, it is not for judges "to weigh the evidence or to determine the credibility of witnesses", Glasser v. United States, supra, 315 U.S. at 80, 62 S.Ct. at 469; our task, once we find that condition satisfied, is the more limited one of determining whether errors prejudicial to the defendants occurred at the trial. Even the bare outline we have given shows that the evidence was sufficient so that a reasonable juror could be convinced of the guilt of

each of the appellants beyond a reasonable doubt.[4] Both the prosecution's case and the defendants' had their strengths and their weaknesses; it was for the jury, under proper instructions, to decide between them. So we pass to the many claims of error pressed upon us.

We have considered all these with care; our opinion will confine itself to those we deem most significant. For convenience we shall divide the claims into three categories: (I) Those relating to matters which arose prior to the judge's charge; (II) those relating to the charge itself; and (III) those relating to matters occurring subsequent to the submission to the jury.

### I. MATTERS ARISING PRIOR TO THE JUDGE'S CHARGE.

(1) *Alleged use of information obtained by unlawful search and seizure.* Counsel for Justice Keogh complain of the court's refusal to grant a hearing, under F.R.Crim.Proc. 41(e), as to the Government's use of information from his personal telephone message books, allegedly obtained by an illegal search and seizure. The facts as to how the Government obtained access to these books were developed at a hearing outside the presence of the jury, when the Government sought to compel their production during presentation of its case and Keogh's trial counsel objected, apparently on the basis of the privilege against self-incrimination, and also, to some extent, through testimony later given by Justice Keogh. After this hearing the Government withdrew its request for production of the message books, but Keogh's trial counsel contended that the facts that had been developed showed that the Government's previous access to the books constituted an illegal search and seizure and thus required a further hearing to determine the information that had been obtained and the use to which it had been put. The claim was that the Government had used the information to "refresh" Erdman's recollection so that his trial testimony as to the dates and times of his contacts with Keogh would tie in with messages recorded in Keogh's books, as his grand jury testimony in July and August, 1961, allegedly had not.

■■ The Government answers that Keogh consented to the examination of the message books, both by giving advance permission and by never expressing any objection despite his knowledge that the examination had taken place.[5] Moreover, it argues that even if access had been illegally obtained, the motion for a hearing looking to suppression of the fruits of the search was untimely under F.R.Crim.Proc. 41(e), coming, as it did, in mid-trial and long after Keogh had learned that the "search" had been conducted. We find it unnecessary to pass on the latter contention, which would require us to consider, among other things, whether the requirement that "if such a claim is made after the trial is under way, the judge must * * *

---

4. The outline may not have shown this with respect to Corallo, who, on the Government's evidence, was an adviser, or perhaps a stimulator, and a temporary holder of some of the funds. But there was ample evidence to raise a question for the jury whether he had joined in the conspiracy; if the jury so found, he was criminally responsible for the acts of the other conspirators and his own failure to perform more than a few overt acts would be immaterial. See Note, Developments in the Law, Criminal Conspiracy, 72 Harv.L.Rev. 920, 946, fn. 168–171 (1959). Corallo did not take the stand.

5. The Government's position is not inconsistent with its withdrawal of the request for production of the books, even if the latter was based on a belief that the evidence adduced at the hearing failed to establish a waiver by Keogh of his privilege against self-incrimination. For the evidence could well have been insufficient to show such a "binding pledge" to waive the privilege as would entitle the Government to require the defendant to *produce* papers that had remained in his possession, see 8 Wigmore, Evidence (McNaughton rev. 1961), § 2275, yet sufficient to show such consent to their *examination* as would negative an unlawful search. Quite evidently this was Judge Weinfeld's view.

be satisfied that the accused could not at an earlier stage have had adequate knowledge to make his claim." Nardone v. United States, 308 U.S. 338, 342, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939), refers only to knowledge of the search and, if so, how complete the knowledge must be, or must include knowledge that what the Government obtained by the search was to be put to a detrimental use. For the evidence here warranted the court's conclusion that no illegal search had occurred.

Two agents of the FBI, Maher and Gallagher, came by appointment to see Justice Keogh in the Kings County Supreme Court on the morning of September 15; he adjourned court and met them in a robing room adjacent to his courtroom on the 7th floor. Justice Keogh's attitude had been one of full cooperation with the Government's investigation; he had been interviewed by FBI agents and had made records of his bank accounts and his checkbooks available to them. Knowing that the FBI wished to interview his two clerks, Benjamin and Seigel, he had arranged for them to be waiting in the robing room. Then, in Keogh's words, "I told my two clerks that I thought it would be more comfortable if they went up to the eleventh floor chambers, * * * and told my clerks to give them [the FBI agents], to the best of their ability, any information they should like". Benjamin's version of Keogh's instruction was, "'Tell them everything they want to know and be cooperative with them'", or, as he restated it, "'Go with these two gentlemen up to the 11th floor chambers and tell them anything they want to know'". Agent Maher testified: "Judge Keogh told Mr. Seigel and Mr. Benjamin that we were going to interview them and that they—he wished that they would cooperate and furnish any information that we requested." After the agents had finished questioning Benjamin in the 11th floor chambers, they asked if the judge kept any notes of his telephone messages. Benjamin showed them the telephone message books,

whereupon "They took, I believe it was, the current book with the hard cover on it and skimmed through the pages". Keogh testified that later in the day one of the clerks "said the agents thumbed through them [the telephone message slips] and asked what the red checks meant, and that was all I heard about that". At no time during his frequent contacts with the Government in the ensuing weeks, during which he submitted to further interviews and testified before the grand jury, did Justice Keogh indicate objection to what had been done.

■■ Judge Weinfeld was warranted in refusing to find in this the "forcible and compulsory extortion of a man's own testimony or of his private papers to be used as evidence to convict him of crime or to forfeit his goods" condemned in Boyd v. United States, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886). True, the protection of the Fourth Amendment is not limited to cases where force is used, as Gouled v. United States, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921), clearly shows. But here we have no case, such as was there presented, of "a representative of any branch or subdivision of the Government of the United States by stealth, or through social acquaintance, or in the guise of a business call" gaining access to a defendant's premises by subterfuge and making a "search and seizure subsequently and secretly * * * in his absence * * *." Here the representatives of the United States came openly and by appointment to get information which Justice Keogh, a former federal prosecutor well aware of his rights, indicated—not only by his words but by his prior and subsequent conduct —that he was entirely willing to give; his consent was quite sufficient to include the telephone message books kept by the clerks. Although each of the many decisions in this area necessarily turns on its own facts, we find Honig v. United States, 208 F.2d 916 (8 Cir. 1953); United States v. Dornblut, 261 F.2d 949 (2 Cir. 1958); and United States v. Martin, 176 F.Supp. 262 (S.D.N.Y.

1959), sustaining the propriety of the agents' conduct, more nearly apposite than others, cited by counsel for Keogh, which held the alleged consent to be involuntary and the search unlawful. While the court was thus warranted in holding that the agents' checking of the telephone message books was not an unlawful search and that there was thus no basis for a separate hearing directed to the suppression of its fruits, this did not prevent Keogh's counsel from developing at the trial itself that the information obtained from the message books had been used to prompt Erdman; he could have called Maher and Gallagher, interrogated them as to what information they had obtained and what they had done with it, and then, on a suitable showing, had Erdman recalled for further cross-examination. We realize that, as a matter of trial tactics, this was a far less attractive course, very likely an altogether unattractive one; but it was all counsel was entitled to.

(2) *Newspaper headlines.* Judge Rayfiel testified on Friday, June 1, 1962, in regard to his luncheon with Justice Keogh on the day preceding the sentencing and to his seeing Dr. Erdman at Keogh's request on the next morning.[6] The Journal American for the afternoon of June 1 carried a large-type banner headline "U. S. Judge accuses Keogh"; the World-Telegram had a four-column headline, "Judge Testifies Keogh Made Bid for Leniency." When the trial resumed on Monday, counsel for the defendants moved for a mistrial. The judge announced he would question the jurors separately in the presence of counsel. The questioning revealed that although all the jurors had followed the judge's instructions not to read newspaper articles about the case, eight jurors and three alternates had not been able to avoid seeing the headlines; they all asserted, however, that these had not affected their ability to decide the case solely on the evidence. The court denied

the motion for a mistrial and also a request that Judge Rayfiel's testimony be read to the jury; but, as we shall see, this testimony was read to the jury at its request on the afternoon before it reached its verdict.

 Whether Judge Rayfiel's direct testimony was that Justice Keogh himself had sought leniency for Moore or merely that he had passed on a friend's request—an issue we shall discuss further when we come to the charge—the World-Telegram's headline was within the range of fair characterization. The Journal American's was not; Judge Rayfiel had simply stated his recollection of the facts and had further said that he saw no impropriety "in anyone speaking in behalf of a man about to be sentenced." A misleading headline printed so large that conscientious jurors cannot help seeing it hardly bespeaks a proud and responsible press, whose constitutional freedom rises no higher than *the criminal defendant's right to a fair trial.* However, we find it quite impossible to believe that the jury, which had seen and heard Judge Rayfiel that afternoon, which was to listen to so much exegesis of his testimony in the way of summations by counsel and instructions by the court, and which was finally to request a reading of that testimony, could have been so affected by an inflammatory verb in a newspaper headline, two weeks before its verdict, as to impeach the verdict's validity. Comparison of the facts here with the publicity relating to inadmissible prior offenses in Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959), or the "build-up of prejudice" in Irvin v. Dowd, 366 U.S. 717, 725, 81 S.Ct. 1639, 1644, 6 L.Ed.2d 751 (1961), shows the inapplicability of these cases, and of the salutary principle for which they stand.

(3) *Admission of evidence of gifts and loans from Erdman to Justice Keogh.* The Government was allowed to prove that Erdman had made gifts to Justice

---

6. The core of Judge Rayfiel's direct testimony as to the luncheon conversation is set forth in footnote 16 infra.

Keogh of a car in 1959 and of storm windows, had lent him $2500 in 1960, had made him a further loan of $1000 on June 28, 1961, when, as Erdman testified, Keogh "said he was going to Great Barrington and that he needed some more money," and, on July 14, 1961, had sent him a further check for $500, Erdman testifying that Justice Keogh had solicited this in terms rather similar to the previous loan, where as Keogh had testified before the grand jury that it was unsolicited. The judge admitted this evidence "solely for the purpose of showing the relationship and association between the defendant Keogh and Erdman"; he reiterated this limitation during the trial and in his charge, adding "There is no claim that the loans were payments in furtherance of the conspiracy" and that "in no respect may the testimony as to the loans or gifts or any exhibits relating thereto be considered as proof of the conspiracy here charged." Counsel for Keogh urge the admission of the evidence was error, claiming that the danger of the jury's viewing the gifts and loans as evidence of other corrupt endeavors outweighed any probative value the material had as showing a friendship between Justice Keogh and Dr. Erdman, which the defense had conceded.

▉ There can hardly be doubt that the evidence passed the basic test of relevancy; "the evidentiary fact offered does not need to have strong, full, superlative, probative value, *does not need to involve demonstration* or to produce persuasion by its sole and intrinsic force, but merely to be *worth consideration by the jury,*" 1 Wigmore, Evidence (3d ed. 1940), 411. A jury could well believe the type of relationship which these transactions tended to establish was far more likely to produce, or to have produced, an attitude of mind in which Keogh might suggest a financial reward for an intercession with Judge Rayfiel than a relation between doctor and patient that had developed into a close friendship. Moreover, characterization of these incidents by the general phrase "gifts and loans" considerably understates their significance. Erd-

man's reference to the 1959 car was a part of his statement that, on their first discussion of the Moore case, Keogh said "that the car I got him in 1959 was a little old and that he could use a new car"; the storm windows and the 1960 loans related to the Justice's summer home at Great Barrington, further requirements for which were listed on the card which Erdman claimed was given to him at the same meeting; the statements of financial need allegedly made in June and July, 1961, tended to show that Keogh needed money for the Great Barrington project and otherwise and thus to support Erdman's story as to the corrupt transactions; and the phrase "some *more* money" in Erdman's description of the June loan was part of a conversation where the possibility of Moore's seeking a refund was also allegedly discussed. The court's restriction on the purpose for which the jury might consider the evidence, although doubtless wise, thus operated to defendants' advantage.

▉ We see no warrant for counsel's fear that the jury was likely to take this evidence as proving generally bad character or previous corrupt efforts to influence the administration of justice. The Government made no such suggestion, and the court expressly narrowed the purpose for which the evidence could be considered. However, if in fact the evidence was susceptible of such use despite the limiting instruction, its admission would still not call for reversal since "the inadmissibility of an evidential fact for one purpose does not prevent its admissibility for any other purpose otherwise proper." 1 Wigmore, supra, at 711. Even if the evidence had been far more liable to improper use than it was, "As we have so often held, evidence relevant to the proof of one crime is not incompetent because it discloses the commission of another." United States v. Eury, 268 F.2d 517, 520 (2 Cir. 1959), citing many cases. True, the trial judge should, in an exercise of sound discretion, exclude evidence tending to show the commission of other

crimes "where the minute peg of relevancy will be entirely obscured by the dirty linen hung upon it." State v. Goebel, 36 Wash.2d 367, 218 P.2d 300, 306, cited in McCormick, Evidence (1954), 333, fn. 28; cf. Grunewald v. United States, 353 U.S. 391, 424–425, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957). But the judge's conclusion that the relevance of this evidence outweighed any tendency to undue prejudice, with the cautionary instruction he repeatedly gave, was in no manner an abuse of discretion; indeed, we think exclusion of the evidence would have been wrong.[7]

■■ ■ (4) *Exclusion of evidence of practice of other Eastern District judges to receive presentence information.* Objection is made to the court's refusal to allow Justice Keogh to testify whether, during the period when he was United States Attorney for the Eastern District in 1945–1949, "there [was] an accepted practice by * * * every federal judge in Brooklyn, to receive information from sources other than the presentence report on the family status and background of persons about to be sentenced"; he was permitted to testify "it was Judge Rayfiel's practice to try to obtain other than through the Probation Department any information that might come from clergymen, relatives, friends, so that he could evaluate the entire panorama of the background of the particular person to be sentenced." Judge Rayfiel had previously stated that "within the limits of the time that was available, I would talk with any person who had anything to say in behalf of a person about to be sentenced." There was no challenge to the defense's point that Justice Keogh was warranted in believing he might properly discuss Moore's sentence with Judge Rayfiel, although, on his own testimony, the aid he could afford was scanty—if his motivation was solely what he claimed it to be. It is thus hard to see the relevancy of evidence showing that, as a result of his experience as United States Attorney a dozen years before, he would have felt equally warranted in having a similar discussion with other judges who at that time had been on the bench of the Eastern District along with Judge Rayfiel, then the junior judge: "[L]egal relevancy denotes, first of all, *something more than a minimum of probative value.* Each single piece of evidence must have a plus value." 1 Wigmore, supra, at 409–10. The court did not err in concluding that the proffered evidence did not meet this standard—particularly in view of the areas that might have had to be opened for rebuttal by the Government if the evidence had been admitted. Trial judges have wide discretion to exclude for remoteness. Duvall v. Birden, 124 Conn. 43, 198 A. 255 (1938); McCormick, supra, at 320.

■■ (5) *Cross-examination of Kahaner with respect to his brokerage accounts.* Kahaner complains of the cross-examination with respect to stock transactions set forth in the margin.[8] On the redirect which followed immediately, he

---

7. People v. Mullens, 292 N.Y. 408, 55 N.E. 2d 479 (1944), heavily relied on by counsel for Keogh, is distinguishable on the ground, stated in the opinion, that "Solomon's habit so to make use of Bitterman's name had already been demonstrated and was undisputed"; hence the evidence showed a "remote and merely cumulative fact" rather clearly pointing to criminal conduct, and its admission was an abuse of discretion. Here, even assuming the evidence to have been as prejudicial as that in Mullens, which we doubt, it was markedly more probative in its relevant aspect.

8. "Q. Mr. Kahaner, did you purchase any stock in the year 1961? A. Yes.

"Q. Isn't it a fact that you purchased $95,000 worth of stock? A. I have no idea of the amount, Mr. Hundley. I use an investment adviser who trades in my account as he sees fit. He buys and sells. If you mean a total of $95,000?

"Q. Yes. A. I would say I bought stocks and sold stocks, some of which was replaced. I don't know the total amount.

"Q. Would you deny that it was $95,-000?

"Mr. Kleinman: Objection, your Honor.

"The Court: I will allow him to answer.

testified that he had never purchased any stock with cash or made any large cash deposits in brokerage or other accounts. It was later stipulated that the only money deposited in his brokerage accounts in 1961 was $200 by check on January 28; hence the large figure in the prosecutor's questions could only have represented purchases made with proceeds from the sale of securities already owned. The contention is that the prosecutor knew this when he asked the questions we have quoted. If this be so, and the Government's brief does not deny it, we must regard this cross-examination as a blemish on what seems otherwise to have been an entirely fair, although properly vigorous, presentation of the Government's case. But the court stopped the inquiry at an early stage, Kahaner largely set matters right only a few moments later, the stipulation finished the job, and no further reference to the matter was made. Under these circumstances, we cannot consider that the prosecutor's questions, unfair though we deem them to have been, created such prejudice as to call for reversal.

▇ (6) *Failure to furnish Jencks Act statements of witnesses against Kahaner.* Rose Kippe, secretary to the Chief Assistant United States Attorney, was called by the Government solely to identify and explain the record she kept of incoming telephone calls that Kahaner had been unable to take; later she appeared as a witness for Kahaner and gave important testimony on his behalf. Complaint is made that, despite a pre-trial agreement that all witnesses' statements subject to production by the Gov-

ernment under 18 U.S.C. § 3500 would be given to defense counsel without the need of request, such a statement of Mrs. Kippe's was not produced until she appeared as a defense witness, when the Government had it marked for identification and made some slight use of it on cross-examination. We have examined the statement; it is in full accord with the very limited testimony given by Mrs. Kippe as a witness for the Government, which was not disputed by anyone. Kahaner's brief also complained of the Government's failure to furnish any statements by Rose St. George, an employee of the United States Attorney's office, and Dr. Fred Miller, an FBI document expert who testified on rebuttal as to certain obliterations in Kahaner's diary; it asked that the Government tell us whether any such statements exist. The Government has advised that there was a report by Dr. Miller made to the FBI on June 7, 1962, the day preceding his testimony; we have read it and find it to be simply a summary of the findings to which Dr. Miller testified. These objections thus fail under the harmless error rule, 28 U.S.C. § 2111. Rosenberg v. United States, 360 U.S. 367, 79 S.Ct. 1231, 3 L.Ed.2d 1304 (1959).

(7) *Use of Moore's grand jury testimony with respect to Corallo.* The case against Corallo rested wholly on the testimony of Erdman and Moore. Both had implicated Corallo in their grand jury testimony, and Erdman did so at the trial. However, on the Government's first question to Moore at the trial which involved Corallo's knowledge of the proposed corrupt endeavor, he answered "I didn't tell Corallo what this $10,000 was

"Q. I will take any explanation you want to give. A. My accounts were at Merrill Lynch and Eastman, Dillon and whatever the accounts reveal are what is in there, Mr. Hundley.
"Q. Would it be fair to say that you had $95,000 worth of stock in 1961? A. I may have.
"Mr. Kleinman: I must object to this. We don't know when it starts, the first purchase, how long he had it or anything else.

"The Court: Yes. If you want to go into this, I think you have to lay a proper foundation. I don't think there is any point in culling one particular figure out and using that. It may distort the true picture.
"If you want to develop the evidence on a permissible legal theory, I will allow it.
"Mr. Hundley: I have no further questions your Honor."

for." Government efforts to refresh Moore's recollection on this and other questions by reference to his grand jury testimony proved largely unsuccessful. He completely exculpated Corallo on cross-examination by the latter's counsel. Thereupon the prosecutor sought permission to examine Moore on his grand jury testimony, stating that he was surprised by Moore's trial testimony since it was substantially different from what Moore had told the grand jury and Moore had given assurances that the grand jury version was the truth. After an overnight adjournment, the court found that with respect to four specific matters the Government's claim of surprise was justified and ruled that, under the authority of Di Carlo v. United States, 6 F.2d 364, 367–368 (2 Cir.), cert. denied, Dicarlo v. United States, 268 U.S. 706, 45 S.Ct. 640, 69 L.Ed. 1168 (1925); United States v. Allied Stevedoring Corp., 241 F.2d 925 (2 Cir.), cert. denied, 353 U.S. 984, 77 S.Ct. 1282 1 L.Ed.2d 1143 (1957); and United States v. Murray, 297 F.2d 812 (2 Cir.), cert. denied, 369 U.S. 828, 82 S.Ct. 845, 7 L.Ed.2d 794 (1962), the Government would be allowed, if a further attempt to refresh Moore's recollection failed, "to question the witness as to whether he had not been asked certain questions and give[n] certain answers thereto as shown by the grand jury testimony on this subject." The court instructed the jury that evidence so taken was to be considered only against Corallo, and also that "To the extent that any evidence was elicited from this witness of his prior testimony before the grand jury, that is not to be treated as affirmative proof of the fact," but "together with his current·trial testimony, only goes to the issue of his credibility on these matters."

■ Counsel for Corallo argues that the prosecutor was not in fact surprised and that, despite the judge's instruction, the jury really was asked to accept Moore's grand jury testimony rather than what he said at the trial. As to the first point, the showing of surprise met the rather modest requirement of such cases as United States v. Graham, 102 F.2d 436, 442 (2 Cir.), cert. denied, 307 U.S. 643, 59 S.Ct. 1041, 83 L.Ed. 1524 (1939); Ellis v. United States, 138 F.2d 612, 616 (8 Cir. 1943); Weaver v. United States, 216 F.2d 23 (9 Cir. 1954); and Stevens v. United States, 256 F.2d 619, 622–623 (9 Cir. 1958). On the second point, the court conformed to the judicially sanctioned ritual; whether the time may not have come to recognize the realism of Corallo's analysis, but to answer it by the franker and bolder approach apparently advocated in Judge Learned Hand's pioneering opinion in Di Carlo, supra, 6 F.2d at 368; see McCormick, supra, § 39; 3 Wigmore, supra, § 1018, note 2; Morgan, Hearsay Dangers, 62 Harv.L.Rev. 177, 192–96 (1948); cf. Bridges v. Wixon, 326 U.S. 135, 150–155, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945), we leave for another day.

## II. CRITICISMS OF THE JUDGE'S CHARGE.

The criticisms of the charge are somewhat more serious. Almost all relate to the judge's handling of the facts. We find but two significant criticisms that relate to the law, and even in those cases, as our discussion will show, the error alleged is not in the statement of the law as such but in its relation to the evidence here.

### A.

■ (1) Kahaner criticizes a portion of the charge where, after stating that it would not be unlawful for Justice Keogh to have spoken to Judge Rayfiel about Moore for disinterested reasons but that it would be if he had received cash from Erdman on behalf of Moore, the judge made the remarks quoted in the margin.[9] The criticism is that there

---

9. "Similarly, it is not illegal to speak, or agree to speak, to a United States Attorney or any assistant in· charge of a prosecution about its status. Thus, the conversation between Kahaner and Williams the assistant United States attorney, who was in charge of the Moore case, is not, in and of itself, proof that

was no evidence that Kahaner had ever "used his position as Williams' superior * * * to obtain suspended sentences for those indicted," and also that, although there was evidence that Kahaner had made some inquiry in January whether Williams would be satisfied to indict two rather than three, there was no evidence that Kahaner had any arrangement with Erdman at the time for a cash consideration. The first criticism seems well taken; it may or may not be a sufficient answer to the second that the jury could have drawn an inference that Kahaner had already formulated an idea of seeking to obtain money from the prospective defendants in the bankruptcy case and thought that success in reducing the number to be indicted would enhance the interest of whose who were. What is a sufficient answer to both criticisms is that no exception was taken, as required by F.R.Crim.Proc. 30, and that the error was a long way from being so prejudicial as to attract the rule, F.R.Crim.Proc. 52 (b), entitling us to notice "Plain errors or defects affecting substantial rights * * * although they were not brought to the attention of the court." Right after the remarks quoted in the margin the judge said that "if you should find that no cash payment was made to Keogh or Kahaner * * * there would be no basis for a finding of corrupt endeavor," and went on to say, "All counsel agree that the central and basic issue in the case is whether the money was paid over to Keogh and Kahaner"—a point which the summations had made abundantly clear. It is quite inconceivable that this jury, whose attention and intelligence are demonstrated so tellingly by the highly pertinent requests for evidence made during its deliberations, convicted Kahaner on the basis of his talk with the Assistant United States Attorney before any money was claimed to have been promised.

■ (2) Another criticism relates to the so-called restitution phase of the conspiracy. The Government's theory, a permissible one under the indictment and the law, was that after the debacle on March 30, the conspiracy continued—with the proposed restitution, an idea allegedly initiated by Kahaner and forwarded by Justice Keogh, simply another means to achieve the same end of reduced punishment. The defendants say it was wrong to let the jury consider this at all since there was no evidence of any corrupt endeavor to influence anyone during this period. Even if we should limit ourselves to Jaspan's testimony, that would hardly be true; if Jaspan was being utilized by the defendants in pursuit of their corrupt endeavor, *non constat* that he knew nothing of the payments and was acting entirely lawfully and in complete good faith. "[I]t is well settled that acts which are in themselves legal lose that character when they become constituent elements of an unlawful scheme." Continental Ore Co. v. Union Carbide Corp., 370 U.S. 690, 707, 82 S.Ct. 1404, 1414, (1962). Moreover, the claim ignores Moore's testimony as to the remark allegedly made by Justice Keogh in relation to Judge Rayfiel to which we have previously referred. The defendants also claim the charge on the restitution phase was erroneous. The court said that the jury must first determine whether the conspiracy ended on March 30; that if it so found, then, in deciding whether a defendant had been a member of the conspiracy, it must exclude all evidence of the restitution plan other than admissions of the particular defendant; but that if it found that the conspiracy con-

Kahaner was a member of a conspiracy corruptly to obstruct justice, as charged in the indictment.

"But if you find that Kahaner used his position as Williams' superior in an endeavor to have fewer persons indicted than those contemplated by Williams or to obtain suspended sentences for those indicted in consideration of cash, paid or to be paid to him under an agreement or arrangement with Erdman, then you have sufficient to find that that endeavor was corrupt and, further, that he was a member of the conspiracy here charged, provided you also find all the other essential elements thereof are established."

tinued beyond March 30 to the end of May, it might consider acts or declarations of all co-conspirators during that period in furtherance of the conspiracy's objectives. This seems entirely right.

### B.

 Appellants rely more heavily on their criticisms, both general and specific, of the judge's treatment of the evidence. The general criticisms, that the judge spent more time in stating the Government's than the defendants' case and that he ignored points developed by the defense on cross-examination and inconsistencies among the Government's witnesses, are rather plainly lacking in merit. The general plan of this portion of the charge was to state first the Government's case and then the defendants' contentions. This is a traditional method of presentation and one rather helpful to the jury since it generally follows the order in which the evidence has been heard, although it almost necessarily involves giving more time to the prosecution's case than the defense, which, in the nature of things, often must take the form of a denial. We cannot believe juries are misled by this method of commenting on the evidence, any more than they are by the fact that more time is usually devoted at the trial to hearing the evidence of the prosecution than of the defense, which sometimes offers none at all. Moreover, doubtless in an effort to prevent any possible unfairness from this organization of the charge, the judge repeatedly interrupted the statement of the Government's case to include at least a portion of the defense's answer. And at the very beginning of his summary of the defendants' contentions, he emphasized that defendants "point to the inconsistencies and contradictions contained in the testimony of government witnesses and the contradiction of their testimony by other government witnesses."

It is convenient, despite some overlapping, to divide the specific attacks into three categories: (1) Failure adequately to charge a theory of defense; (2) misstatements of the evidence; and (3) failure adequately to present defendants' answers to various claims of the Government.

(1) Counsel for Kahaner did not question that Moore had paid $35,000 to Erdman in aid of a corrupt endeavor to influence the administration of justice. His theory, which was joined generally by the other defendants save that counsel for Keogh also questioned whether the money ever had been raised, was that Erdman intended from the outset to pocket the money, did exactly that, and then, when his iniquity was discovered, decided to implicate Kahaner, Keogh and Corallo in an effort to gain favor with the Government, with Moore joining in the endeavor for the same reason. More specifically, the theory was that Erdman's cupidity had been aroused when he learned the prospective defendants were thinking of engaging a well-known Washington, D. C., lawyer for $60,000 plus an estimated $10,000 for disbursements; that, after first suggesting that a New York lawyer could be retained for half that amount, he had the happy thought of getting this money for himself by promising to bring about the desired result through corrupt means; that he pressured Moore down the primrose path; and that he then lulled Moore and the other defendants in the bankruptcy case into a false sense of security by talk of arrangements with Kahaner and later of assistance from Justice Keogh which existed almost exclusively in Erdman's mind and on his tongue. Defendants claim this theory received substantial support from one of the wholly disinterested witnesses, M. Hallsted Christ, the trustee in bankruptcy of Gibraltor. Christ had called Erdman shortly before July 13 to say that the first of Moore's $1000 notes had been returned for lack of funds and to ask Erdman to make good; Erdman said he had already sent a check to Jaspan. Christ went on: "In the course of my conversation with Dr. Erdman, he indicated that he had security of $35,000 and asked me whether I could get any leads on assets of Mr. Moore that would bring him an additional $15,000

and he indicated that he had a firm of attorneys working to obtain that additional $15,000." Under date of July 13, Erdman wrote Christ a letter which began:

"Sorry to have caused you any inconvenience. Mr. Moore apparently now feels that his case is unreasonable and he apparently does not plan to pay his notes. I am security for the first $35,000.00 and certainly would appreciate it if further security for the $15,000.00 could be obtained. Any information you have regarding this would be appreciated."

Interpreting the letter in the light of Christ's testimony as to the telephone call and other undisputed facts, it seems entirely clear, despite the Government's contention to the contrary, that, as indeed Erdman admitted on cross-examination, he meant "I am secured for the first $35,000"—a highly significant figure on defendants' theory. When taxed with this, Erdman said his statement as to security related to $35,000 in Ace Manufacturing Co.—an explanation which was attacked by Keogh's counsel in summation, which the Government does not attempt to elucidate in its brief, and which we do not understand. After the charge had been concluded, Kahaner's counsel—admitting "I overlooked it completely in my request"—asked the judge "to charge the jury with respect to the testimony of Mr. Christ and * * * the letter of July 13th, that it is part of the defendant Kahaner's theory that Erdman got the money and keep [sic] it." After noting that counsel had argued the point to the jury in his summation, the judge declined.

As was held in United States v. Strassman, 241 F.2d 784 (2 Cir. 1957), such an oral request made after the conclusion of the charge was too late under F.R.Crim.Proc. 30—a rule grounded both on the danger of error inherent in the necessarily rapid consideration of an oral request at such a time and on the possibly undue impact of a separate charge devoted to a single fact or theory. Still we might well invoke the "plain error" provision of Rule 52(b) if such a basic theory of defense as that Erdman intended to and did keep the money, had in no way been put before the jury. But that was not at all the case. The theory had been extensively argued in the opening on behalf of Keogh, and in the summation of Kahaner's counsel which also included the support allegedly afforded by Christ's testimony and Erdman's letter. Moreover the charge itself told the jury, in a passage previously quoted, that the one thing on which all counsel agreed was that the jury could not find Keogh or Kahaner guilty unless it found that the money was paid to them; after all it had heard, the jury scarcely needed to be told explicitly in the charge that the money could not have been paid to Kahaner and Keogh if Erdman had kept it.

(2) Judge Weinfeld described the meeting at which the $35,000 plan was first put by Erdman before Moore, Deutsch and Cohen in the manner set forth in the margin.[10] The defendants level two attacks at this:

The first concerns the dates assigned to the telephone call from Kahaner to Erdman and Erdman's meeting with Moore, Deutsch and Cohen. At one point in his direct examination Moore gave the

10. "Thereafter, according to Erdman, past the second week of February, Kahaner called him and said three of those arrested would be indicted; three would not, and that he would see that the indicted three would be treated softly by having the case brought before an agreeable judge in April, for which he wanted $35,000; and thereafter, just past February 14th, about the 15th or 16th, Erd-man conveyed Kahaner's request and information to Deutsch, Cohen and Moore.

"In addition to Erdman, Moore, Deutsch and Cohen, the other alleged participants in the conference, testified; and while there are differences as to some matters which were discussed, they appear to be in accord that Kahaner's proposal for a payment to him of $35,-000 was submitted by Erdman at that meeting."

date of the delivery of the first $5,000 to Erdman, which, of course, was subsequent to the meeting, as "the 10th of February—yes, about the 12th or 13th of February." Under cross-examination by Kahaner's counsel, Moore said repeatedly that the meeting at which Erdman first asked for money was on February 10 or "a day either way, the 10th or 11th." The importance of this was that Kahaner concededly was on a vacation in the Caribbean from February 2 to 13; hence, if the meeting was on February 10 or 11, Kahaner could not have called Erdman shortly before it as Erdman claimed. Kahaner's counsel took proper exception to the judge's failure to call the jury's attention to Moore's testimony as to the date.

 Although it would have been better if the judge had done so, we do not find his refusal to modify his charge to have been prejudicial. The charge itself was accurate; Erdman had fixed the call from Kahaner as "past the second week of February." Moreover, Moore himself on direct examination had first described the meeting as being "About the middle of February", and during his cross-examination, even before Kahaner's counsel had gotten him thoroughly committed to February 10 or 11 as the date of the meeting, Moore had altered the date of the delivery of the money from February 10, as he had testified on the previous day, to February 20—a date consistent with Erdman's fixing the telephone call at a date after Kahaner's return. Deutsch and Cohen also placed the meeting during the week of February 12. More important, the point as to the date had been developed by Kahaner's counsel on summation with such skill and vigor that it must have been deeply impressed on the jury's mind—an impression that ought to have been reinforced by the judge's saying, in his summary of Kahaner's defense, "that shortly thereafter [i. e., after his talk with Williams] he left for a holiday and did not return to the United States until February 14th." This issue was of the sort the judge may have had in mind when he emphasized in his additional charge, given after taking the exceptions, "that counsel, during the course of their summations, referred to various matters which they stressed and believed were important and to which I did not refer, and, of course, you will bear these matters in mind."

 The other attack concerns the judge's statement that the four participants in the meeting, although differing as to some matters, "appear to be in accord that Kahaner's proposal for a payment to him of $35,000 was submitted by Erdman at that meeting." This was not correct. The four participants were in accord that a $35,000 payment was proposed, and Erdman and Moore were in accord that Erdman had characterized the proposal as coming from Kahaner and as being for a payment to him. But Deutsch testified only that "Dr. Erdman told Mr. Moore that he thought he could do something for him, that it would cost $35,000. And he said he is doing it for my cousin, that was the only reason that he had gotten involved." Cohen said on direct examination "At that time Dr. Erdman told him [Moore] that $35,000 would take care of it"; under cross-examination he elaborated that he believed at the time that the $35,000 was going to a lawyer for his fee.

Analyzing the record from our vantage point, the variance can be deemed quite significant. Throughout the trial no witness save Erdman and Moore testified that Kahaner ever sought a payment or that any payment was made; corroboration of Erdman's mention of a Kahaner proposal for a payment, even from coconspirators such as Deutsch and Cohen, would thus be important, and their failure to recount this even more so. We find no indication, however, that any such significance was attributed to the judge's slip by anyone at the trial. No exception was taken by defense counsel; had it been, the judge would doubtless have given a corrective instruction as he did on another matter, where no actual error had occurred. This absence of exception is important, not merely from the standpoint of compliance with F.R.

Crim.Proc. 30 and the necessity, on which the Rule rests, for avoiding re-trials on grounds not called to the judge's attention, but for another reason we find equally pertinent here. If the judge's inadvertent error did not attract the attention of any of the alert and capable counsel representing these defendants, it is fanciful to think that this single sentence in a charge of more than sixty printed pages so impressed the jury as to have influenced their decision—and to have done this despite the judge's admonition, made more emphatic by repetition in his additional charge, that "if any reference by me does not accord with your recollection, you will disregard entirely what I have said and be guided by your own independent recollection." Appellants say the latter instruction is a mere formal incantation with which jurors cannot possibly comply in a trial of this length. So it might be if the judge had delivered the kind of invective described in Quercia v. United States, 289 U.S. 466, 53 S.Ct. 698, 77 L.Ed. 1321 (1933), which appellants cite to us, or even if he had mistakenly stressed that Deutsch and Cohen had corroborated Erdman and Moore in this important particular. But where nothing of the sort occurred, it is at least an equal defiance of reality to suppose that this mistaken reference, which did not attract an objection from attentive counsel, lingered in the jury's mind.

(3) Appellants' many other criticisms relate to alleged inaccuracy in the sense not of misstatements [11] but of claimed failure to convey the full thrust of their evidence. We shall deal specifically only with the two most important; for the rest we must be content with some general observations, which are also pertinent to the particular criticisms about to be discussed and, in some measure, to those that have been.

It is quite impracticable for a trial judge, summarizing a case to a jury, to develop each piece of evidence offered in support of an indictment, each item offered in rebuttal, and each opposing inference sought to be drawn. An appellate court reviewing such a summary not only must consider it as a whole but must place it in the setting created by the jury's hearing of the evidence and the summations of counsel. Many of appellants' contentions on this phase of the case read as if Judge Weinfeld alone had heard the witnesses and the summations, with the jury receiving nothing but the charge. Although on such a hypothesis the summary here would not have adequately conveyed the case of either side, nothing follows from that; if the judge had thought the jury was solely dependent on his summary, he would surely have made a quite different one. True, "The evidence, if stated at all, should be stated accurately, as well that which makes in favor of a party as that which makes against him;" Burke v. Maxwell, 81 Pa. 139, 153, quoted with approval in Starr v. United States, 153 U.S. 614, 626, 14 S.Ct. 919, 38 L.Ed. 841 (1894); but if this were pressed to the extent of requiring the inclusion of every thrust and counterthrust, the judge would be taking over the province of the witnesses and of counsel. Judge Weinfeld was at pains to make it clear he essayed no such role, as the remarks already quoted show.[12] Moreover, al-

11. They would regard their point relating to Judge Rayfiel's testimony as being a misstatement, but we would not for reasons developed below.

12. While a federal judge is privileged to "sum up the facts to the jury" if these are clearly left subject to its determination, Starr v. United States, supra, 153 U.S. at 624–625, 14 S.Ct. at 922, he is not required to do so. Whether or not he should, rests "in his discretion," ibid.; it "is within his province, whenever he thinks it necessary." Quercia v. United States, supra, 289 U.S. at 469, 53 S.Ct. at 699. Although we would not wish to press any thoughts on this subject against the views of experienced trial judges, it may not be amiss to query whether trial judges in this circuit address themselves to this preliminary question as regularly as might be wise. Thus, without remotely suggesting that it could be deemed error for the judge here to have summarized the evidence—or even that it

though our discussion is necessarily focused on the claims of the defendants as to the judge's failure to bring out evidence and inferences favorable to them, it is fair to note that he likewise made no reference to items strongly relied on by the Government.[13]

(a) One of the critical elements in the case against Kahaner was his alleged meeting with Erdman and Moore at a coffee shop near the Federal Building in Brooklyn on the morning of March 29, when he is claimed to have received the final $2500. The judge earlier instructed that, in contrast to most of the overt acts charged in the indictment, the Government was required to establish this date with precision. In the portion of his charge concerning the Government's case the judge summarized Erdman's testimony that he had arranged the meeting on March 28, stated "So, too, the Government emphasizes that Kahaner's message diary, Kahaner Exhibit T, contains an entry on March 28th, 'Dr. Erdman called; call him,' but he doesn't recall if he returned the call," recounted Erdman's and Moore's version of the encounter with Kahaner, and went on "You will here too recognize that not only does Kahaner deny this but swore that on the morning of March 29th he

conferred with Judge Harry Frank at the Supreme Court, Manhattan, and did not return to his office until about 10:10 or 10:15." Later, in summarizing Kahaner's defense, he made the statement quoted in the margin.[14] On counsel's oral request after the charge, the judge, again referring to Kahaner's claim to having been in Judge Frank's chambers on the morning of March 29, added "While Kahaner has testified and also offered other evidence in support of his alibi, this does not relieve the government of its burden upon the whole case of establishing beyond a reasonable doubt that on the morning of March 29th, Moore handed Kahaner, in Erdman's presence, $2,500 in the coffee shop in Brooklyn."

Counsel for Kahaner urges that the judge's endeavor to make a fair statement of the evidence on this important phase of the case failed in various respects. These are (i) that although the statement as to Justice Frank's lack of independent recollection of the date was literally correct, a fair reading of the testimony shows he believed the meeting occurred on the 29th rather than the 28th; (ii) that Kahaner's appointment book for March 29 shows at the top

---

13. One such item, which we cite simply by way of illustration, is the contrast, heavily stressed in the prosecutor's summation, between Justice Keogh's first F.B.I. statement that Erdman came alone to his chambers on March 29 and his later statements that Erdman came with Moore and a man introduced as Forman, and his justification of the change on the basis simply of having consulted his diary entry "12:30 LR—Sanford Moore."

14. "As to March 29th, when both Erdman and Moore swore the $2,500 was given to Kahaner, he gives the lie to them. He swears that on that morning he con-

would have been if objection had been made—we cannot but wonder whether, in a case like this, with a single-count indictment and after three days of pointed but fair summations by capable counsel, much was accomplished through another, and necessarily more compressed, summary by the judge.

ferred with Judge Frank, then sitting in the New York County Supreme Court, just across the street from this courthouse; that he was there from 9:30 or 9:40 to about 10:00 o'clock; that although the sign-in book that is in his own office has him entered at 10 o'clock, actually he got to his office at about 10:10 or 10:15 a. m.

"In support, he offers the testimony of Mrs. Kippe that she tried to locate him that morning at Judge Frank's chambers because word had been received that he was to be sworn in as United States Attorney pending official nomination of the new United States Attorney.

"Judge Frank, called by the Government, had no independent recollection as to whether he saw Kahaner and talked with him on March 28th or March 29th. He did recall, however, that whenever it was that Kahaner came to his chambers, it was sometime between 9:30 and 10 o'clock."

"Rm 557—Judge Frank"; [15] (iii) that Mrs. Kippe testified she had seen this entry on the morning of March 29 when endeavoring to locate Kahaner; and (iv) that Kahaner's telephone message book, kept by Mrs. Kippe to record calls during his absence, showed a call from Dr. Erdman at 9:30 A.M. on March 29, this corresponding to the time when Erdman claimed he was with Moore and Kahaner in the Brooklyn coffee shop, and when Moore, whose testimony was in conflict with Erdman's on this point, claimed that Erdman was calling Kahaner in Moore's presence, speaking to him, and arranging the meeting for later that morning. Only the last of these omissions was made the subject of exception.

 All these items were excellent points for argument on Kahaner's behalf; they were excellently argued by his counsel. But, as we have said, if the judge's summary of the evidence is to be a summary, it has to stop somewhere. While Judge Weinfeld's summary did omit some evidence favorable to Kahaner on this issue, it also omitted the Government's *ripostes*—Kahaner's signing out on the mornings of *both* March 28 *and* March 29 for "Official Business, Supreme Court"; his failure to call witnesses to corroborate his explanation that on March 28 he had in fact been with Internal Revenue agents and in the Surrogate's Court; the absence of any record of the call from Chief Judge Bruchhausen's office on the morning of March 29 which was claimed to have led to Mrs. Kippe's efforts to locate Kahaner; the testimony of the Government's expert witness that the entry with respect to the March 29 appointment with Justice Frank was written with two different instruments; and the contention that even if Kahaner's appointment with Justice Frank was on March 29, there was still time for him to meet Erdman and Moore before arriving in the Federal Building around 10:15 A.M. Had the judge mentioned these answers of the Government, it would doubtless be

contended that Kahaner's replications should likewise have been stated. This episode illustrates that, as we have said, the judge's summary cannot be expected to perform the office of the witnesses and of counsel, and his omission to state a piece of evidence cannot be transmuted into an implied direction to the jury not to consider it when his express direction was the opposite. This is what lies behind the statement in Allis v. United States, 155 U.S. 117, 124, 15 S.Ct. 36, 39, 39 L.Ed. 91 (1894), "we know of no rule that compels a court to recapitulate all the items of the evidence, even all bearing upon a single question."

██ (b) Counsel for Keogh criticize the summary of Judge Rayfiel's testimony. In outlining the Government's case, Judge Weinfeld said:

"Judge Rayfiel testified that Keogh mentioned the Moore case; that Keogh said a good friend had talked to him on behalf of Moore; that his friend informed him Moore was a fine fellow and 'wondered whether leniency could be extended to him.'"

When he came to Justice Keogh's defense, he stated:

"Contrary to Judge Rayfiel's testimony, he states that he did then mention Erdman's name as the friend of Moore on whose behalf he was speaking. Keogh also denies Judge Rayfiel's testimony on direct examination that he asked that leniency be extended to Moore. He testified that he made no suggestion as to the sentence to be imposed on Moore, and Judge Rayfiel, under cross-examination, testified to like effect."

It is contended that this cast Judge Rayfiel in an unfavorable light by making out that he first testified that Justice Keogh himself had sought leniency for Moore and then changed his testimony on cross-examination for Keogh's benefit, and that it placed Justice Keogh in

---

15. Room 557 was the room in the New York County Supreme Court building which Justice Frank was occupying.

the position of contradicting Judge Rayfiel's direct testimony; in fact, it is claimed, Judge Rayfiel had testified both on direct and on cross-examination that Keogh was simply transmitting a friend's request. This is said to be particularly serious in view of the episode of the newspaper headlines discussed above. Although the interpretation of Judge Rayfiel's direct testimony [16] is debatable, looking only at the cold type we would read it as appellants do, although it still could be considered inconsistent with Keogh's unqualified statement, "I didn't ask him to extend leniency." However, the matter does not seem to us to have the significance that appellants' counsel attach to it; evidently it did not strike them as significant at the time, since no exception was taken—and this although a colloquy on the occasion of the newspaper headlines should have alerted counsel to Judge Weinfeld's different understanding of Judge Rayfiel's testimony.

The two exceptions that were taken to the summary of Judge Rayfiel's testimony concern the failure to mention either Judge Rayfiel's corroboration of Keogh's testimony that the appointment for Erdman to come to the Judge's chambers was made on the morning of March 30, or his statement that Justice Keogh had never communicated with him in regard to the Moore case save on those two occasions, which is claimed to discredit the testimony of Moore and Erdman as to the remark allegedly made by Justice Keogh during the restitution phase. We see no need to add to our previous discussion of such omissions beyond pointing out again that, at the jury's request, the whole of Judge Rayfiel's testimony was read to them on the afternoon before they reached their verdict.

### III. MATTERS ARISING AFTER SUBMISSION TO THE JURY.

The jury retired to deliberate at 3:50 P.M. on Thursday, June 14, 1962; it rendered its verdict at 7 P.M. on Saturday, June 16; it had sat late on both Thursday and Friday evenings. However, a considerable fraction of this time was spent in listening to testimony which it had requested. Three episodes in this interval, two relating to the same subject, are attacked.

■ (1) *Alleged interference with the jury by newsmen.* On Friday afternoon counsel for Justice Keogh brought to Judge Weinfeld's attention that, as he had been informed, photographers and television camera men crowded around the jurors and took their pictures when they left the courthouse late on Thursday night and for lunch on Friday, and "some of the newspapermen were running along beside the jury asking them questions;" he thought it was "the marshal's duty to see to it that it doesn't occur." Government counsel made a similar report and expressed similar concern. The judge shared the concern and stated he would speak to the United States Marshal; no suggestion was then made that he ought declare a mistrial, although Keogh's counsel was to urge this as an additional ground on the motion for a mistrial made that evening on exception to the judge's giving the "Allen charge." After a brief interval the judge recalled counsel and told them, apparently to their complete satisfaction, that he had talked with the Marshal and been assured that such incidents would not be allowed to recur. There is no suggestion that they did.

Appellants assert these facts bring the case within the holding in Remmer v. United States, 347 U.S. 227, 229, 74 S.Ct. 450, 98 L.Ed. 654 (1954), that "In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court

---

16. "He told me that a good friend had spoken to him about Moore, told him that he, Sanford Moore was to appear before me the following day for sentence. And that his friend informed him that Moore was a very fine fellow and wondered

and the instructions and directions of the court made during the trial, with full knowledge of the parties." But the facts of the Remmer case, particularly as these are spelled out in the Supreme Court's subsequent opinion, 350 U.S. 377, 76 S. Ct. 425, 100 L.Ed. 435 (1956), are so different as to make its holding inapplicable. In Remmer a juror had received a bribe offer from the defendant which he had reported to the judge, and then had been interviewed by the F.B.I.; the combined effect of the two incidents could well have impaired his freedom in voting. Here there was nothing to indicate that the fleeting remarks of the newsmen, whatever they were, would have frightened or overawed a juror. See United States v. Catalano, 231 F.2d 67 (2 Cir. 1956). We do not take lightly such interference with the proper conduct of trials; if camera men and reporters will not police themselves to prevent such annoyance of jurors, and the marshals are unable to police them effectively, sterner measures will be required. However, we see no basis in this episode for setting aside a verdict rendered more than a day after the last of the alleged disturbances—especially when counsel for all parties were apparently satisfied with the measures taken by the judge to put the situation in hand.

(2) The "Allen charge." Late in the evening of Friday, June 15, the foreman of the jury sent a note to the court saying "We find it impossible to come to an agreement."[17] The jury having returned to court, the judge addressed them. He referred to the foreman's note as expressing a "desire to discontinue your efforts." He said "It is desirable if a verdict can be reached that this be done both from the viewpoint of the defendants and the Government", but that this was true only if the verdict "reflects the conscientious judgment of each juror and under no circumstance must any juror yield his conscientious judgment."

He noted that "This Court has no purpose to ask and indeed does not have the right to inquire as to how you stand. But considering the length of the trial, the amount of testimony that was taken, the number of witnesses that have been heard, further consideration on your part is fully justified." The judge said in amplification that, considering the time devoted to the reading of testimony and to meals, "you really have not spent more than eight or nine hours in actual deliberations and I do not consider that a sufficient time to have elapsed to permit you a full and fair opportunity not only to review the evidence but to discuss and consider amongst yourselves the various phases of the evidence."

After these and other remarks of like tenor, the judge stated that he wanted "to read to you a statement which is contained in a Supreme Court opinion which is fairly well known to bench and bar called the Allen charge * * *." He then read the familiar statement, 164 U.S. 492, 501, 17 S.Ct. 154, 157, 41 L.Ed. 528 (1896), remarked that it would be best if the jury adjourned its deliberations until morning, and concluded that "It has been a long trial and a trial, as I say, where I am satisfied each side prefers finality of judgment if it can be obtained on the basis of a conscientious reflection of each juror's final vote." Exceptions of defense counsel were overruled and a motion for a mistrial denied; however, the judge recalled the jury and again emphasized, in a variety of ways, that "if any individual juror still retains a conscientious view that differs from that of other jurors, * * * you are not to yield your judgment"; "you are not to yield your judgment simply because you may be outnumbered or outweighed," etc.

Quite early on Saturday morning, the jury requested a copy of the indictment and two exhibits relating to Kahaner. At 12:30 P.M. it made another inquiry,

whether leniency could be extended to him."

17. The judge did not show the note to counsel, although he had it marked as a court exhibit.

relating to a Keogh exhibit. After lunch at 3:20 P.M., it asked for a reading of Judge Rayfiel's testimony, exhibits relating to the pleas and sentencing of the three defendants in the criminal bankruptcy case, and "Allen charge as read to us last night by your Honor." Judge Weinfeld complied with the last request by reading from the Supreme Court's opinion, but again added the caution that "your final vote must be only for that verdict which accords with your individual judgment, based upon the evidence and the law."

This recital of the facts suffices almost without more to dispose of the characterization, made by one of the appellants, that "The jury was being coerced by being subjected, in these circumstances, on two separate occasions to the 'dynamite' Allen charge." On the contrary, if the charge is to be given at all, we do not see how this could be done with less tendency to coercion or more emphasis on the need for conscientious individual agreement than in the way Judge Weinfeld did it.[18] To say that the jury was twice "subjected" to the charge is scarcely accurate; on the second occasion it was the jury itself that asked for rereading of the charge, and it was quite natural for the judge to comply with the request, as the absence of any objection or exception by defense counsel confirms. We readily agree with appellants that the circumstances strongly suggest that the jurors were debating just what the Allen charge said—without, however, accepting appellants' conclusion that there was any impropriety in the jury's seeking to settle the argument by the sensible course of asking to hear it again. The case does not present even such evidence of "dynamite" as is sometimes asserted to exist when a verdict follows almost immediately after the giving of the Allen charge; the jury continued to deliberate all morning and well into the afternoon, twice asking for pertinent exhibits, returned in mid-afternoon, requesting highly relevant material and the rereading of the Allen charge, and then deliberated for another several hours in the light of all it had heard and received.

We are likewise unable to follow appellants' argument that the giving of the charge, or at least the response to the jury's request for its repetition, was unlawful "because the Court could not help but know that the jurors still were in disagreement and that a minority existed," thereby making applicable the rule of Burton v. United States, 196 U.S. 283, 307–308, 25 S.Ct. 243, 49 L.Ed. 482 (1905), and Brasfield v. United States, 272 U.S. 448, 47 S.Ct. 135, 71 L.Ed. 345 (1926), finding error in an inquiry by the judge as to the numerical division of the jury, a rule which we applied in United States v. Samuel Dunkel & Co., 173 F.2d 506 (2 Cir. 1949), where the inquiry was whether there was "a pronounced majority." We have been cited to no case where this rule was applied in the absence of an inquiry by the judge.

18. Recent cases from other Circuits are distinguishable as involving charges that "went beyond" the language of the Allen case in urging the jurors to resolve their differences. See United States v. Rogers, 289 F.2d 433, 434–437 (4 Cir. 1961); Powell v. United States, 297 F.2d 318 (5 Cir. 1961); Green v. United States, 309 F.2d 852 (5 Cir. 1962). It is true that some of our colleagues in the Fifth Circuit have expressed in dicta or dissenting opinions doubt whether even the Allen charge *simpliciter* should ever be given. Green v. United States, supra, 309 F.2d at 854 & ns. 1–3; Huffman v. United States, 297 F.2d 754, 759 (5 Cir.) (Brown, J., dissenting), cert. denied, 370 U.S. 955, 82 S.Ct. 1605, 8 L.Ed.2d 820 (1962); Andrews v. United States, 309 F.2d 127, 129 (5 Cir. 1962) (Wisdom, J., dissenting). We respectfully disagree. Giving the charge itself has often—indeed recently—been upheld in this Circuit, e. g., United States v. Thomas, 282 F.2d 191, 195 (2 Cir. 1960); United States v. Tolub, 309 F.2d 286, 289–290 (2 Cir. 1962), and this is *a fortiori* permissible when it is diluted, as it was here, with additional warnings that no juror should give up his individual conscientious judgment.

Here the court not only made no such inquiry but expressly told the jury that it had "no purpose to ask and indeed does not have the right to inquire as to how you stand." To say that the Allen charge, which speaks in terms of the consideration that needs to be given by a dissenting juror "if much the larger number were for conviction" and of the minority's duty "to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority," cannot be given if the judge has any reason to believe that the jury's division is other than even, defies ordinary sense.

 Appellants' final contention is that even though we should hold that no one of the matters here considered would alone call for reversal, we must view their points not separately but in combination. That is peculiarly true with respect to a jury trial where there was such real basis for the existence of reasonable doubt and the consequences of a wrong verdict are so tragic. But this was not at all a case where errors, though minor, were numerous. In the long period of the trial prior to the charge, we have noted but one item calling for criticism—and that of the prosecutor and not of the judge; we have found no errors by the judge in the period during the jury's deliberation and scarcely any—and these not excepted to —in the charge. Absolute perfection in trials will not be attained so long as human beings conduct them; few trials of this length and difficulty can have been so nearly free of error as this one. Although the closeness of factual issues bears directly on the magnitude of error required for reversal, the command of Congress that "On the hearing of any appeal * * * in any case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties," 28 U.S.C. § 2111, applies to great causes as well as small. In a case so long and hard-fought as this an appellate court must be careful lest "the perspective of the living trial is lost in the search for error in a dead record," Glasser v. United States, 315 U.S., supra, at 88, 62 S.Ct. at 473 (Mr. Justice Frankfurter dissenting). The number of claims of error we have thought it right to discuss in this opinion has been due, not to misconduct of the trial by the able and conscientious judge, but rather to the acumen and assiduity of devoted counsel for the defendants in raising points for our consideration, and also to our own desire, because of the special poignancy of this case, not simply to consider these, as we would in any event, but to state the results of our consideration more fully than we should ordinarily deem appropriate. We hold that the issue of defendants' guilt was placed before the jury in a manner that was fair and in accord with applicable rules of law; our writ runs no further.

The judgment is affirmed.

## On Petition for Rehearing and for Stay of Mandate

PER CURIAM.

The petitions for rehearing point out two respects in which our opinion of April 25, 1963, was incomplete.

The discussion (p. 472) of the exclusion of testimony by Justice Keogh on the practice of other judges in the Eastern District of New York as to receiving presentence information when he was United States Attorney failed to mention the sustaining of objections to a question addressed to him whether, after his retirement from that post, he had discussed this practice with judges in the Eastern District, and to questions addressed to another state court judge, called as a character witness, whether he had ever spoken to a federal judge before sentencing concerning a man whom he did not represent, and the rejection of an offer to prove that two judges in the Southern District considered it "proper and legal to receive in-

formation concerning the family background, status and economic condition of persons about to be sentenced privately and from sources other than the presentence report or governmental agencies." But we hold that the trial judge was warranted in excluding such evidence, the two latter items of which were even more remote and more likely to open up collateral issues. As we pointed out, the Government made no claim of impropriety in Justice Keogh's luncheon conference with Judge Rayfiel (although, on his own testimony, he had no information of substance concerning Moore to impart) unless Keogh was acting for a corrupt motive, and Judge Weinfeld charged that all counsel agreed the jury could not find Keogh guilty unless they were convinced that money was paid to him.

The other item is that our discussion of the alleged interference with the jury by newsmen (pp. 482, 483) omitted a statement by Keogh's trial counsel that on Friday evening, June 15, after the judge's instructions to the marshal, "when we went out to dinner, there were cameramen there. I had to ask them to go away, they wouldn't go away." This in no way affects the point that there was no evidence of further questioning or other harassment of the jury after the incident on Friday noon.

Save for these corrections, the petitions for rehearing, insofar as they seek action by the panel, are denied. Issuance of the mandate is stayed until the entry of an order on the petitions for rehearing in banc. If such petitions should be granted, the mandate will be further stayed until final determination; if they should be denied, it will be stayed for thirty days from the date of such denial and thereafter if within that time a certificate is received from the clerk of the Supreme Court of the United States as to the filing of a petition for certiorari etc. as provided in Rule 28(c) of this Court.